*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RENE E. LIMERES, | ) | |
| | ) | Supreme Court No. S-14970 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-09292 CI |
| v. | ) | |
| | ) | O P I N I O N |
| AMY W. LIMERES, | ) | |
| | ) | No. 6875 - March 14, 2014 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Rene E. Limeres, pro se, Healy, Appellant. David W. Baranow, Law Offices of David Baranow, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

I.      INTRODUCTION

The parents of three minor children divorced. The father appeals the court's determination of his child support obligations, its factual findings regarding child custody and visitation, its valuation and division of the marital estate, its denial of attorney's fees, and its denial of a continuance. We affirm on all issues.

## II.     FACTS AND PROCEEDINGS

Amy and Rene Limeres were married in 1997 and had three children together.  Amy is an attorney; Rene has made money from a variety of self-employment activities, including guiding, writing articles about the outdoors, and selling books.  The couple separated in July 2011, and Amy filed for divorce.

On August 2, 2011, Amy petitioned for ex parte and long-term protective orders.  The court denied the ex parte petition, and the parties later cancelled the hearing on the long-term protective order, having both retained counsel and embarked on settlement negotiations.  In the meantime, on August 22, 2011, the court entered a mutual civil no-contact order on the parties' request.

Amy and Rene failed to reach a settlement, and in October 2011 the court held a hearing on Amy's request for a long-term protective order.  Amy testified that Rene had threatened to shoot her and that he repeatedly violated the no-contact order with emails, letters, and voice mail messages.  Rene admitted to violating the no-contact order, though he denied any bad intent.

The court granted the long-term protective order, finding that Rene had "threatened . . . to blow petitioner's head off with a shotgun if she touched their alleged marijuana plants in his greenhouse" and that this threat constituted fourth degree assault. The court withheld judgment as to whether there was "possible telephone harassment," finding that this depended "on the content of multiple voice mail messages" that had not yet been produced in discovery.  The court also ordered that Amy retain possession of the marital home, that Rene complete an anger management or batterers' intervention program, and that all visitation between Rene and the children be supervised.

The court held an interim custody hearing in November 2011.  It heard testimony from Amy about additional violations of the no-contact order and violations

of the subsequent long-term domestic violence protective order, including Rene's arrest for following Amy in his vehicle. The court issued an interim order reiterating its prior orders on possession of the marital home and supervised visitation; it also declined to award spousal support to Rene but awarded him $4,000 in interim attorney's fees. Finally, the court found that Rene had committed multiple violations of the no-contact order, but it deferred a ruling on sanctions until his criminal prosecution was resolved.[1]

The court held a two-day divorce and custody trial in July 2012. Following trial it granted the requested divorce and awarded sole legal and physical custody of the three children to Amy. The court found that Rene's net annual income was $40,000 and that he was obligated to pay child support of $1,514 per month retroactive to August 1, 2011. The court also divided the marital property, awarding the marital home to Amy.

Rene filed a motion for reconsideration, which the court denied. Rene appeals.

## III. STANDARDS OF REVIEW

We review an award of child support for abuse of discretion.[2] We review the superior court's factual findings regarding a party's income for purposes of calculating child support for clear error.[3] Whether the superior court applied the correct

---

[1] The criminal charges were dismissed by the prosecution in February 2012.

[2] *Swaney v. Granger*, 297 P.3d 132, 136 (Alaska 2013) (citing *Faulkner v. Goldfuss*, 46 P.3d 993, 996 (Alaska 2002)).

[3] *Koller v. Reft*, 71 P.3d 800, 804 (Alaska 2003) (citing *Routh v. Andreassen*, 19 P.3d 593, 595) (Alaska 2001)).

legal standard to its child support determination is a question of law that we review de novo.[4]

The superior court has broad discretion in its determinations of child custody.[5] We will not set aside the superior court's child custody determination unless its factual findings are clearly erroneous or it abused its discretion.[6] A finding is clearly erroneous when our "review of the entire record leaves us 'with a definite and firm conviction that a mistake has been made.' "[7] "The trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[8] In a child custody case, there is an abuse of discretion if the trial court considered improper factors or improperly weighed certain factors in making its determination.[9]

The equitable division of marital assets involves three steps: (1) determining what property is available for distribution, (2) finding the value of the

---

[4]     *Id.* (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001)).

[5]     *Cusack v. Cusack*, 202 P.3d 1156, 1158 (Alaska 2009) (citing *Blanton v. Yourkowski*, 180 P.3d 948, 951 (Alaska 2008)).

[6]     *Id.* (citing *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008)).

[7]     *Millette*, 177 P.3d at 261 (quoting *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)).

[8]     *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

[9]     *Cusack*, 202 P.3d at 1158 (citing *Millette*, 177 P.3d at 261).

property, and (3) dividing the property equitably.[10] Under the first step, we review the "[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate" for clear error.[11] Whether "the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment."[12] The second step, the valuation of property, is a factual determination that we review for clear error.[13] We review the trial court's third step, the equitable allocation of property, for abuse of discretion.[14] An equal division of property is presumptively valid.[15]

The superior court has broad discretion in awarding attorney's fees in a divorce action, and we review any award for abuse of discretion.[16] An award of attorney's fees "will not be disturbed on appeal unless it is 'arbitrary, capricious, or manifestly unreasonable.' "[17]

---

[10]    *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013).

[11]    *Id.* at 459.

[12]    *Id.* (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

[13]    *Id.*

[14]    *Id.*

[15]    *McLaren v. McLaren*, 268 P.3d 323, 332 (Alaska 2012) (citing *Elliott v. James*, 977 P.2d 727, 730 (Alaska 1999)).

[16]    *Hopper v. Hopper*, 171 P.3d 124, 129 (Alaska 2007).

[17]    *Ferguson v. Ferguson*, 195 P.3d 127, 130 (Alaska 2008) (quoting *Hopper,* 171 P.3d at 129).

We review the trial court's refusal to grant a continuance for abuse of discretion.[18] "An abuse of discretion exists when a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling."[19]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Its Child Support Order.

#### 1. The superior court's finding regarding Rene's income is not clearly erroneous.

Based on Rene's testimony, the superior court found that he earned "at least $40,000 annually" for purposes of calculating child support. Rene appeals this finding, arguing that his earnings were in fact substantially less. But Rene's own testimony was in conflict. At the time of the interim custody hearing, in November 2011, he testified that his income for that year would be approximately $40,000. At the same hearing, he testified that $40,000 was actually a "generous extrapolation" and that his income would be closer to $38,000. As the superior court noted, however, Rene testified at trial about his "generation of substantial funds, in the hundreds of thousands of dollars, in terms of book sales, inventory on hand, royalties and guiding fees, and claim[ed] to have provided at least $23,000.00, prior to the parties' separation, for the direct needs of the children over the course of one year."[20] Rene was unwilling or unable to provide specifics as to the amount of money he had made in recent years from guiding. He did, however, describe several books he had authored, one of which he said had generated between $273,000 and $364,000 of "revenue that has basically been incorporated in our family

---

[18] *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011) (quoting *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989)).

[19] *Id.*

[20] Rene actually testified that he had given Amy $23,000 "over the space of two months."

coffers," though he clarified that these figures represented gross revenues before the cost of printing. He testified that the hardcover edition of the same book generated revenue of $22,000 to $29,000, and he identified two other books he said had generated as much as $42,000 and $17,000 in revenues respectively. Three months after trial, in response to Amy's proposed findings of fact and conclusions of law, Rene submitted his 2011 tax returns and a Child Support Affidavit that showed income of $8,426.82. However, given Rene's earlier testimony, we cannot say that the court clearly erred when it found his yearly income to be approximately $40,000 despite what he reported on his income tax return.[21]

### 2. The superior court did not abuse its discretion by not using an income-averaging method.

Rene argues that the superior court should have averaged his income over several years in order to determine his child support obligation. Comment III(E) to Alaska Civil Rule 90.3 allows the court "to average the obligor's past income over several years" when the obligor "has had very erratic income in the past."[22] Here, the superior court repeatedly asked Rene to estimate his average income over the past five years, but Rene's answers were evasive. The court cannot have abused its discretion by failing to use an averaging method when Rene did not provide the evidentiary basis on which to do so.

---

[21] In his reply brief, Rene argues that the superior court erred by failing to deduct his federal income tax obligation from his estimated income. However, "issues not argued in opening appellate briefs are waived. This issue applies equally to pro se litigants." *Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010).

[22] Whether to average a parent's income in this context is left to the trial court's discretion. *See, e.g.*, *Keturi v. Keturi*, 84 P.3d 408, 413 (Alaska 2004) (holding there was no abuse of discretion in income averaging where the father admitted that his income fluctuated).

**B.** **The Superior Court Did Not Err In Its Order For Custody And Visitation.**

The superior court is required to determine custody in accordance with the best interests of the child, with reference to the relevant statutory factors.[23] Rene concedes that the superior court, in awarding legal and physical custody of the children to Amy, considered the relevant factors in its findings, but he argues that the findings are "simply not supported by the evidence."

**1.** **The superior court did not clearly err in its best interest findings.**

Rene disputes the trial court's determination, in reference to the first, second, and fourth statutory best interest factors,[24] that Amy "appears . . . to be significantly more in tune with the children's physical, educational, social and religious needs," contending that the court gave too little weight to "the unique and enriching opportunities his presence has brought to [the children's] lives" through outdoor adventure and recreation. But the court carefully considered Rene's testimony, noting that he "prides himself on his knowledge of nature and the outdoors, resulting in his consequent exposure of the children to the beauty of nature and outdoor activities," but that Amy "has provided significantly greater exposure to a rich variety of experiences." This finding was not clearly erroneous. Rene's argument that the court improperly preferred Amy's mainstream religious beliefs over his own "organic belief system" is also without merit. The court addressed religion in its discussion of the variety of

---

[23] AS 25.24.150(c).

[24] AS 25.24.150(c)(1) ("the physical, emotional, mental, religious, and social needs of the child"); (2) ("the capability and desire of each parent to meet these needs"); and (4) ("the love and affection existing between the child and each parent").

experiences and activities that Amy provided the children; it did not purport to decide that her religious beliefs were superior to Rene's.

Rene also challenges the superior court's conclusion that Amy was more likely "to facilitate and encourage a close and continuing relationship between the other parent and the [children],"[25] contending that he had demonstrated at trial Amy's "systematic efforts to exclude [Rene] from the children's lives." But the evidence supports the court's finding that Rene "significantly and intentionally disparaged [Amy] . . . in the presence of and directly to the children on multiple occasions"[26] as well as the court's reciprocal finding that there was no evidence of "any inclination of the mother to respond or reciprocate in kind with inappropriate slurs or commentary about the father." Rene argues, in essence, that the superior court should have disbelieved Amy's testimony on this subject and credited his testimony instead, along with his proposed inferences from the evidence. However, we "grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony,"[27] and under that standard we see no clear error in the court's findings on this issue.[28]

---

[25] AS 25.24.150(c)(6).

[26] Rene admits in his brief that he "made no attempt to hide his opinion of the mental state of his ex-wife . . . in his writings" but that these opinions were not "meant for" or "ever shared with" the children.

[27] *Stanhope v. Stanhope*, 306 P.3d 1282, 1287 (Alaska 2013) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009)).

[28] Rene contends that Amy's behavior is like that of the mother in *Pinneo v. Pinneo*, 835 P.2d 1233, 1238 (Alaska 1992), who was found to have attempted to "erode[] the bonds of love and affection" by limiting the father's access to the children. But there were no allegations of domestic violence in *Pinneo*, and the father had

(continued...)

Rene next contends that the superior court made unsupported findings in connection with the children's preferences.[29] The court found that the two youngest children were "not as yet capable of expressing a particularly mature preference for their long-term custodial placement and immediate visitation purposes" but that the oldest daughter, as described in Amy's testimony, was "particularly sensitive to the strife engendered by the father." The court concluded that although "the children love each parent and are loved by each parent in return," they felt safe and comfortable with Amy and were resistant to contact with Rene "at this time." Rene challenges Amy's version of some of the events on which the children's discomfort with him were allegedly based, but again we defer to the superior court's first-hand determination that Amy's testimony was the more credible.[30]

Rene also challenges the court's finding that the parties have a "quite pronounced inability . . . to effectively communicate and cooperate in the decision-making process," making joint legal custody impractical.[31] Rene argues that the parties

---

**[28]**(...continued)
"reasonable visitation rights." *Id.* at 1234. Here, a court order required that any visitation between Rene and the children be supervised; the primary limits on Rene's access to the children were not imposed by Amy but by the court.

**[29]** *See* AS 25.24.150(c)(3).

**[30]** *See Stanhope*, 306 P.3d at 1287. It is largely because of the superior court's closer perspective on witness credibility that we also reject Rene's argument that Amy's perceptions "and thus her whole credibility as a witness" were affected by anxiety, stress, or other mental problems. Moreover, the court allowed Rene to cross-examine Amy extensively about her health history, but he adduced no evidence that her perception of events was affected by a medical condition.

**[31]** "[J]oint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest." *Ronny M. v. Nanette H.*, 303 P.3d 392,
(continued...)

communicated well throughout their marriage and that "[i]ntractable conflict arose only on separation," and that this was attributable to actions by Amy. But this case involved both a stipulated mutual no-contact order and a long-term protective order, and there was a considerable amount of other evidence of the parties' difficulties in sharing information and making decisions together. Again we see no clear error in the court's finding of fact, particularly given Rene's own recognition that, whatever the cause, his relationship with Amy is currently marked by a serious lack of cooperation.

We conclude that the superior court did not clearly err in its findings of fact when considering these statutory best interest factors.

### 2. The superior court did not abuse its discretion in ordering supervised visitation.

The court also considered evidence of domestic violence, as it was required to do. Evidence of domestic violence is important to child custody in two statutory contexts. First, the court must consider "any evidence of domestic violence . . . in the proposed custodial household" in its best interests determination.[32] Second, if the court finds that a parent has a history of perpetrating domestic violence, a rebuttable presumption arises against granting that parent custody or unsupervised visitation.[33] Here, the superior court considered the evidence of domestic violence in its analysis of the best interests of the children and found "a substantial and pronounced history of domestic violence on the part of the father," referencing specifically the long-term restraining order entered against Rene in October 2011.

---

[31](...continued)
405 (Alaska 2013) (quoting *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991)).

[32]     AS 25.24.150(c)(7).

[33]     AS 25.24.150(g)-(j).

Rene argues that this finding was erroneous because it referenced only one incident.[34] In addition to Amy's testimony that Rene had threatened to kill her with a shotgun (the sole factual basis for the October 2011 long-term protective order on which the court relied), the court had heard testimony at the interim custody hearing and at trial that Rene had violated the protective order by following her in his car, prompting a call to the police and Rene's arrest. While that may have constituted a crime of domestic violence,[35] the court made no findings about it, particularly about whether the act was knowingly committed "with reckless disregard that the act violates or would violate a provision of the protective order," as required for it to constitute a crime under AS 11.56.740(a)(1). The court had also, in earlier orders, found repeated violations of the civil no-contact order based on Amy's testimony about repeated emails, letters, and voice mails from Rene.[36] But the statutory definition of domestic violence does not include violations of civil no-contact orders,[37] and the court made no other findings about

---

[34] Under AS 25.24.150(h), a history of perpetrating domestic violence means either that "during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence." Since it was not alleged that Rene had caused serious physical injury, the finding of a history of domestic violence required a finding that there was more than one incident.

[35] *See* AS 18.66.990(3)(G) ("Domestic violence" includes the crime of "violating a protective order").

[36] Indeed, Rene concedes in his brief that "[t]he testimony and documents of the mother, particularly after she enlisted the aid of counsel . . . , are rife with references to abuse, domestic violence, threats, fear and even terror."

[37] As noted above, "domestic violence" includes the crime of "violating a protective order under AS 11.56.740(a)(1)," AS 18.66.990(3)(G), but AS 11.56.740(a)(1) applies only to orders "issued or filed under AS 18.66 and containing a provision listed in AS 18.66.100(c)(1)-(7)"; the civil no-contact order at

(continued...)

harassment, stalking, or assault that could amount to a crime of domestic violence. We thus conclude that there were insufficient findings to demonstrate a history of domestic violence for purposes of AS 25.24.150(j).

If this were the basis for the court's restricted visitation order, we would be compelled to reverse and remand for further findings.[38] But notwithstanding the court's finding that there was a history of domestic violence, it appears that its order for supervised visitation was based instead on Rene's failure to complete the batterers' classes that had been imposed in October 2011 by the long-term domestic violence restraining order. At the close of trial, the court summarized its preliminary view of custody:

> My hands are really tied on the custody issue, Mr. Limeres, just so you're clear. The current custody situation is not going to change until at the minimum you've completed the DVI/batterers' intervention program, *we made that clear in April* . . . [T]he immediate future is not going to change.

(Emphasis added.)

Rene protested that "[t]here's no history of domestic violence, [just] a single incident," to which the court responded, "I want you to complete [the batterers' program] in good faith and show you've completed it successfully. And when you have done that, that will constitute a change of circumstances." The superior court's reference

---

[37](...continued)
issue here does not meet that definition.

[38]     *Cf. Puddicombe v. Dreka*, 167 P.3d 73, 77 (Alaska 2007) (when the court finds that domestic violence has occurred, it is plain error for it not to make findings as to whether the domestic violence amounts to a history for purposes of AS 25.24.150(g)-(I)). This case presents a similar issue but in a different posture: the court found a history of domestic violence without making all the findings in support of that history.

to an earlier order "in April" helps clarify its thinking for purposes of our review. In April 2012, in denying Rene's motion for reconsideration of an order regarding interim custody, the court held:

> In order to move beyond supervised visitation, Mr. Limeres must complete a 36-week batterers['] intervention program. He testified that he has completed 12 weeks of an anger management component thus far and did not understand that he needed to complete the entire 36-week program. The requirement was explained to him at the hearing and he was made aware that he needs to recommence the program by May 14, 2012 in order to receive credit for the 12 weeks already taken[.]

By the time of trial in July, Rene had still not completed the batterers' intervention classes. In its post-trial findings, the superior court apparently intended to continue, rather than terminate, the relevant provisions of the October 2011 restraining order: the findings refer to "the extant restraining order" and provide that "[t]he father *shall remain* restricted and subject to professionally supervised visitation only." (Emphasis added.) The superior court's order for supervised visitation appears to have been based not on a history of domestic violence but on Rene's continuing failure to comply with the terms of the preexisting order that placed conditions on his visitation.[39]

An order requiring supervised visitation "must be supported by findings that specify how unsupervised visitation will adversely affect" the child's best interests.[40]

---

[39]    The requirement for supervised visitation entered as part of the long-term domestic violence protective order was made pursuant to AS 25.20.061. Subsection (2) of that statute states: "If visitation is awarded to a parent who has committed a crime involving domestic violence, . . . the court may set conditions for the visitation, including . . . [that] visitation shall be supervised by another person or agency and under specified conditions as ordered by the court."

[40]    *J.F.E. v. J.A.S.*, 930 P.2d 409, 413-14 (Alaska 1996).

Because the court's post-trial order continued the restrictions from preexisting orders, we look to the preexisting orders to determine whether the restrictions were adequately supported. In its interim order dated November 21, 2011, the court concluded that professionally supervised visitation was required because of "defendant's mental and emotional state" and referred to the rationale it had placed orally on the record. At the hearing the court held that Rene's visitation must be supervised by a person who was "detached" and had an "authoritative demeanor, and sometimes a very strong personality." The court observed that supervision would likely be too daunting a task for "an ordinary lay person" because of Rene's "potent combination" of "a great deal of stress, . . . a great deal of emotional anguish, . . . visible pain and a great deal of anger, at times brimming with resentment over the fact of the divorce and the issues in the case, all mixed with hostility and frankly a high sense of entitlement," and the court stated that it did not "want to expose an ordinary lay person [to that] or put them in a situation . . . where they were exposed to those types of emotions and possible risks." The court expressly concluded that professionally supervised visitation was necessary to "ensure the safety of the children."[41]

We conclude that the court's order for supervised visitation has adequate support in the record. And because the order did not hinge on the court's finding of a history of domestic violence, the lack of specific findings sufficient to support such a history is harmless error.

---

[41] The court had heard testimony from Amy about voice mail messages from the children expressing fear that Rene would take them from school, as well as evidence that Rene had involved the children in a number of his violations of the civil no-contact order.

**C. The Superior Court Did Not Err In Its Valuation And Division Of The Marital Estate.**

Equitable division of marital assets involves a three-step process: (1) determining what property is available for distribution, (2) valuing the property, and (3) equitably allocating the property.[42] Rene challenges the court's findings under steps (2) and (3).

Rene first disputes the values the court placed on the parties' two real properties: the marital home and the "relatively undeveloped rural land parcel" identified as the "Birch Creek property." At trial, Amy presented a professional appraisal of the marital home that valued it at $240,000. Rene presented his own opinion of the house's value — $275,000.[43] Though the court stated orally, following trial, that it was "leaning toward the $250[,000]-$260[,000] range based on the valuation testimony of Mr. Limeres," it expressly "reserv[ed] the issue of valuation" for its written findings of fact, which ultimately adopted the appraisal as the best evidence of value. It was not clear error for the court to accept the professional appraisal over Rene's lay opinion.[44]

As for the Birch Creek property, the court awarded it to Rene using Amy's suggested value of $6,600. Rene contends that this was an overvaluation, relying on his own testimony that he had purchased the parcel for $4,000 and that there was an issue

---

[42]   *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2001).

[43]   Rene also tried to introduce evidence of the 2012 municipal tax assessment of the home and several real estate listings in the neighborhood, but the court did not admit this evidence.

[44]   *See Cartee v. Cartee*, 239 P.3d 707, 719 (Alaska 2010) ("[T]he evidentiary weight to be given to an owner's opinion testimony as to the value of his property falls squarely within the trial court's discretion.").

with access.  But given that the court had only the parties' competing opinions on which to decide the property's value, we cannot see that it clearly erred by accepting Amy's.

Rene also alleges that the court overvalued several vehicles, pieces of art, miscellaneous gear, and unsold books, and that it erroneously excluded certain appliances from the value of the home.  But again we give particular deference to the superior court's findings when they require weighing conflicts in oral testimony, including conflicting lay opinions of value.[45]  The court found Amy's asset spreadsheet to contain the most credible evidence of value, and this finding was well within its discretion.[46]

We also conclude that the superior court did not abuse its discretion in its equal division of the marital estate.  "Alaska courts favor an equal, 50/50 division of marital property, and such a division is presumptively valid."[47]  Rene argues that the superior court failed to consider the factors listed in AS 25.24.160(a)(4) in dividing the estate, such that the result failed to "fairly allocate the economic effect of divorce."[48]  He argues specifically that the court failed to consider "[t]he gross disparity in economic status between the parties and the mother's considerably greater earning power"; "[t]he difference in the parties' ages (the father is 60, the mother is 48), station in life[,] and circumstances"; "[t]he greater hardship faced by the father in rebuilding his life 'from scratch' "; and Rene's need to pay for his own health insurance, formerly provided through Amy's employer.  But the court did state that it had "carefully considered the

---

[45]     *Stanhope v. Stanhope*, 306 P.3d 1282, 1287 (Alaska 2013).

[46]     *See id.* at 1291 (The wife's "property list, admitted as an exhibit, was evidence of value that the superior court was allowed to consider.").

[47]     *McLaren v. McLaren*, 268 P.3d 323, 341 (Alaska 2012).

[48]     AS 25.24.160(a)(4).

ages, earning capacities, [and the] current and . . . future allocated assets and debts of the parties," and it made specific findings as to Rene's earning capacity. The court was not required to "make findings pertaining to each factor."[49] Besides, despite Rene's position on appeal, he argued in pretrial motions and at trial for an equal allocation of the marital assets and debt. The superior court did not abuse its discretion in making a presumptively reasonable 50/50 allocation of the marital property.

### D.  The Superior Court Did Not Improperly Delegate Its Fact-Finding.

Rene argues that the superior court erred by adopting uncritically the draft findings of fact proposed by Amy's attorney. A trial court "abuses its discretion when it adopts, without explanation or change, proposed findings of fact and conclusions of law that substantially deviate from the court's earlier oral decision."[50]

But the court here stated at the close of trial that its oral remarks were not intended to be conclusive, and it is not cause for objection that its immediate view of the evidence was modified in some particulars by time and by the post-trial submissions of the parties. We conclude that the court did not abuse its discretion when it entered the findings of fact and conclusions of law that Amy drafted.

### E.  The Superior Court Did Not Abuse Its Discretion When It Declined To Award Additional Attorney's Fees To Rene.

Alaska Statute 25.24.140(a)(1) allows the superior court to award attorney's fees and costs to a spouse during the pendency of a divorce action. The purpose of this statute is to "assure that both spouses have the proper means to litigate the divorce action

---

[49]  *Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999).

[50]  *Ogden v. Ogden*, 39 P.3d 513, 518 (Alaska 2001) (citing *McDougall v. Lumpkin*, 11 P.3d 990, 998 (Alaska 2001)).

on a fairly equal plane."[51] Rene argues that the trial court should have awarded him more attorney's fees given the parties' income disparity.

The trial court did consider the parties' relative economic situations when it awarded Rene interim attorney's fees of $4,000. In its order denying an award of additional fees later in the case, the court reasoned that (1) it had already made one award of interim fees, (2) Rene was no longer represented by counsel, and (3) Amy had incurred substantial attorney's fees herself as a result of the domestic violence that prompted the October 2011 restraining order, "fees for which she has not been compensated." These rationales are sufficient to support the court's denial of additional fees to Rene, and we conclude that there was no abuse of discretion.

F.      The Superior Court Did Not Abuse Its Discretion When It Denied Rene's Motion For A Continuance.

At a trial-setting conference in April 2012, the parties were offered possible trial dates in July and October 2012. Rene agreed to the earlier date. A month later, however, he moved for a continuance, arguing that the coming summer months were his best time for making money, and that given time and sufficient income he might be able to hire new counsel and better prepare his case. In his reply he added that a continuance would allow him to complete the required batterers' program before the court decided issues of custody and possession of the marital home. The court denied the continuance.

A trial court abuses its discretion in denying a continuance where "a party has been deprived of a substantial right or seriously prejudiced by" the ruling.[52] In this

_____

[51]      *Heustess v. Kelley-Heustess*, 259 P.3d 462, 479 (Alaska 2011) (quoting *Sanders v. Sanders*, 902 P.2d 310, 319 (Alaska 1995)) (internal quotation marks omitted).

[52]      *Wagner v. Wagner*, 299 P.3d 170, 173 (Alaska 2013) (quoting *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011)) (internal quotation marks omitted).

case, Rene was able to prepare his case, presenting three witnesses, two hours of his own testimony, and 18 exhibits. As for the batterers' program, it is possible that Rene would have completed it had trial been postponed, and, as a result, he might not have been subject to the custody and visitation restrictions the superior court imposed. But the court explained on the record that Rene could move for a modification once he had completed the classes, reiterating this in its written findings. We conclude that Rene was not seriously prejudiced by the superior court's denial of a continuance, and we therefore find that the ruling was not an abuse of discretion.

## V.    CONCLUSION

The judgment of the superior court is AFFIRMED.