NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHARITY L. MASSIE, | ) | |
| | ) | Supreme Court No. S-18732 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-20-01675 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| DARRELL L. MASSIE, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2077 – March 5, 2025 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Roberta C. Erwin, Palmier ~ Erwin, LLC, Anchorage, for Appellant. John J. Sherman, Sherman Law Office, LLC, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

I.      **INTRODUCTION**

One party appeals several aspects of the superior court's property division order in a divorce case. We largely affirm the order, remanding for two purposes: (1) correction of three line-item entries in the court's spreadsheet of marital assets and debts, and (2) reconsideration of the decision to categorize one litigation expense — the cost of a home appraisal — as a marital debt.

---

\*      Entered under Alaska Appellate Rule 214.

## II. BACKGROUND

Charity and Darrell Massie married in 2003 and have three children.[1] Darrell filed for divorce in 2020, and a trial of property and custody issues was held in late 2022. At the close of evidence the court found the parties to be on equal footing economically and ruled that the marital estate would therefore be divided 50/50. It ordered the parties to submit proposed findings of fact on all contested issues.

The marital home had burned down a few weeks before trial. Charity and the children were living there at the time; Darrell had moved out when the parties separated. As a preliminary ruling following trial, the court ordered that the parties work together to prioritize Charity's access to fire insurance proceeds to cover "the relocation and interim housing cost . . . while this rebuild [was] happening."

The court issued its written findings of fact and conclusions of law about a month later, largely adopting Darrell's proposed property distribution spreadsheet. After soliciting more information from the parties with regard to particular valuations, the court issued supplemental findings. Charity appeals.

## III. STANDARD OF REVIEW

There are three steps to a superior court's division of marital assets: "(1) determining what property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[2] "Under the first step, we review the '[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate' for clear error."[3] We review de novo whether "the trial court applied the correct legal rule in exercising its discretion" for factual determinations regarding

---

[1] Because the parties have the same last name, we refer to them by first names for clarity.

[2] *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017) (quoting *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014)).

[3] *Id.* (alteration in original) (quoting *Limeres*, 320 P.3d at 296).

marital property.[4]  Step two, valuation of property, is also a "factual determination that we review for clear error."[5]  "Clear error is found only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[6]  "Where the superior court's factual findings are based upon the court's assessment of witness credibility and its weighing of conflicting evidence, those findings receive 'particular deference'; we do not reweigh evidence or make credibility determinations."[7]

We review the third step, "the equitable allocation of property, for abuse of discretion."[8]  "We find an abuse of discretion if the court considered improper factors, failed to consider statutorily mandated factors, or gave too much weight to some factors."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Its Valuation Of The Palace Elite Vacation Club Membership.

The superior court awarded Charity the couple's interest in a vacation club membership called "Palace Elite," valuing it at $20,000.  The evidence showed that the parties purchased this club membership during their marriage for $25,500, though Darrell testified it was purchased through Charity's business, it "just ha[d] Charity's name on it," and he "had no financial ties to" it.  Essentially, the membership gave the couple the opportunity to stay at luxury resorts for a certain number of "free" weeks,

---

[4]     *Id.*

[5]     *Id.* (quoting *Limeres*, 320 P.3d at 296).

[6]     *Id.* (internal quotation marks omitted) (quoting *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013)).

[7]     *Vazquez v. State*, 544 P.3d 1178, 1185 (Alaska 2024) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

[8]     *Hockema*, 403 P.3d at 1088 (quoting *Limeres*, 320 P.3d at 296).

[9]     *Hudson v. Hudson*, 532 P.3d 272, 279 (Alaska 2023).

with a discount on stays after the free weeks had been used up. At the time of the divorce proceedings there were no free weeks remaining. But Darrell testified that Charity continued to use the membership for family vacations.

Charity argues that the court grossly overvalued the asset. She first disputes whether it is properly characterized as a timeshare, which is what the superior court called it. But this definitional question is immaterial to the asset's value. According to Charity, all that remains is a ten percent "discount code" with no tangible worth unless applied to a rental; more "free" weeks would have to be purchased. In response, Darrell points to the parties' initial agreement to a $20,000 value in their joint property spreadsheet, which was admitted without objection at trial. He also relies on an exhibit showing a $20,000 "Asking Price" for a similar resort club membership, though Charity counters that this package includes "60 elite weeks" presumably at no extra cost.

The value of a ten percent discount — assuming that Charity correctly characterizes what remains of the asset — depends on the price the discount is applied to, how often the discount can be used, and the life of the discount-holder's membership, none of which is apparent from the record. In short, the superior court had little evidence on which to rely. We review its value determination for clear error and will not reverse it unless we have a definite and firm conviction that a mistake has been made.[10] Given the sparse record, the parties' initial agreement on the asset's value, and the testimony that Charity continues to use it, we are not left with a definite and firm conviction that the court made a mistake.

B.   **The Final Property Spreadsheet Contains Several Line-Item Errors.**

Charity argues that the superior court erred by adopting Darrell's proposed property spreadsheet because it fails to reflect the court's actual findings in several

---

[10]   *See Hockema*, 403 P.3d at 1088.

respects. These relate to a Conex storage container, garage shelving and fence posts, cabinets, some assets of Charity's business, and the sauna.

First, the spreadsheet awarded the garage shelving, fence posts, and sauna to Charity, but she contends that these items were part of the marital home and are separately accounted for, either through the equal division of the fire insurance proceeds or the eventual sale of the house. In his brief, Darrell agrees, so these matters are not in dispute and should be corrected on remand to reflect the parties' agreement.

Second, the spreadsheet awards the "20' Storage Connex" (sic) to Darrell with a value of $6,000, noting that each party gave it that value. Charity contends that "Darrell testified at trial that it was worth $8,000" and that she agreed; she appears to contend that the court erred by failing to recognize the parties' stipulated $8,000 value.

The testimony on which Charity relies to show agreement, however, is not particularly clear. Darrell testified that in his work he bought Conexes "all the time," and that "today the used price for a used Conex is $8,000." His lawyer informed him that "she says it's only $6,000" and asked if he wanted it at that value, to which Darrell replied, "Take her $6,000." His lawyer then asked, "Even though you said $8,000?" Darrell replied, "Oh, that's what I'd buy it for today; correct." They left it there.

Charity never mentioned the Conex in her own testimony, nor does she now direct us to any other evidence of its value. We note that her own property list, submitted as a trial exhibit, gave the "Connex" (sic) a value of $3,000. On this limited and ambiguous evidence, again, we are not left with a definite and firm conviction that the court made a mistake by giving the Conex a $6,000 value.[11]

Charity's remaining challenges to line items on the spreadsheet are briefed inadequately if at all. For the cabinets, Charity says they "are in Darrell's possession, but were awarded to Charity," but she does not explain why this constitutes an error,

---

[11] *See id.*

cite to the record, or provide any analysis based in either law or logic. For the business assets, Charity claims they "were double counted on the spread sheet" because the court awarded the business "and its assets to Charity" but separately awarded some business assets to Darrell. Again, Charity cites to no evidence that the individual items she identifies on the spreadsheet as business assets — "Office Storage Unit" and "Office Chairs" and "Plow for Truck" — were actually assets of the business,[12] nor does she cite to the record or any legal authority. Because she gives these points such cursory and unhelpful treatment, we do not consider them further.[13]

In sum, then, we note the following three errors in the court's property spreadsheet that should be corrected on remand: (1) the garage shelving (line 93), (2) the fence posts (line 102), and the sauna (line 128) should be removed as line items allocated to one party or the other because they are subsumed in the court's disposition of the marital home and the fire insurance proceeds.

C. **The Trial Court Did Not Err By Awarding Darrell Half The Fire Insurance Proceeds And A Credit For Mortgage And Utility Payments.**

The superior court dealt with the fire loss of the marital home in several ways. First, immediately following trial, it advised the parties to work together to ensure that Charity had the funds she needed from the fire insurance policy for relocation and interim housing for her and the children while the marital home was being rebuilt. In its later written findings of fact and conclusions of law, the court

---

[12]    We note that there are also line items on the spreadsheet for "Office Desks" and "Wall Art (Office)," awarded to Charity, which she does not challenge. We note also that the "Plow for Truck" presumably matches up with the "2002 Chevy 2500 HD w/ plow hook-up," which the parties agreed should be awarded to Darrell.

[13]    *See Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1104 (Alaska 2023) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (alteration in original) (quoting *Windel v. Carnahan*, 379 P.3d 971, 980 (Alaska 2016))).

ordered that "[t]he most fair and equitable way to divide the home is to sell it and split the proceeds," which would be done "[a]fter repair"; and the costs of repair "to maximize the sales price will be split by the parties."

As for the mortgage and utility payments during the repair phase, the court ordered the parties to "equally split the cost," with the qualification that Darrell could "choose to move into the residence during the reconstruction phase until the home is sold." If he did so, then he "would be responsible for the mortgage and utilities until the home is sold or he chooses to vacate the home," but he "would be entitled to one-half of the rental subsidy for [Charity] [from the fire insurance proceeds] as an offset credit at the time of sale for his mortgage/utility costs in [the] home." As for personal property lost in the fire, the court noted the parties' agreement that reimbursement for some items on the court's property spreadsheet "would be split 50/50"; that reimbursement for marital property not on the spreadsheet would also "be split 50/50"; and that any reimbursement for items purchased by Charity or the children post-separation would be paid to Charity.

### 1.     Equal division of insurance proceeds for lost personal property

Charity appears to challenge two aspects of these rulings related to the marital home. First, though acknowledging the parties' agreement at trial to divide the fire insurance proceeds equally, she now argues that it was unfair to order that equal split with regard to reimbursement for lost personal property because "Darrell testified that there was no personal property of his left in the marital residence" and "he had received everything he wanted or expected out of the house."

But again, the testimony on which Charity relies is not that clear. Darrell testified that "all of the possessions [in the marital home] have been occupied by [Charity] and taken over," and when asked if he had "everything that [he] want[ed] or expect[ed] out of the house," he replied, "Other than the value of half a life that was built." The court could reasonably interpret this testimony as Darrell's

acknowledgment that he would never recover the personal property he had left behind, not a disclaimer of any interest in its monetary value as represented by the insurance proceeds. The court did not err by enforcing the parties' agreement to share those proceeds 50/50 in the absence of unambiguous testimony that they later agreed to something else.[14]

### 2. Credit against sale price for payment of mortgage and utilities

Charity also argues that the court abused its discretion by crediting Darrell with a future offset against the marital home's sale price in the amount of half the sum paid by the fire insurance for Charity's relocation and interim housing. The offset was meant to reflect Darrell's payment of the mortgage and utilities if he chose to occupy the home during its reconstruction (and while the fire insurance was paying for Charity's interim housing); if he did not live in the marital home, the parties would continue to share the home's expenses. Charity does not attempt to explain why this is an unfair arrangement; her only argument is that it conflicts with "the court's prior ruling that the relocation and interim housing proceeds would go to Charity," citing the trial transcript.

But the superior court's intent in its post-trial rulings was clear. At the close of evidence it ordered the parties to submit proposed findings in two weeks, but in the meantime it noted its immediate concern that Charity — having been forced out of the marital home by the fire — have her relocation and interim housing costs covered:

---

**14** *See Henash v. Ipalook*, 985 P.2d 442, 450 (Alaska 1999) ("Sound judicial policy dictates that private settlements and stipulations between the parties are to be favored and should not be lightly set aside." (quoting *City & Borough of Sitka v. Constr. & Gen. Laborers Loc. 942*, 644 P.2d 227, 234 n.18 (Alaska 1982))); *Partridge v. Partridge*, 239 P.3d 680, 689 (Alaska 2010) (applying this principle in context of divorce property settlements and holding that stipulations are enforceable absent "fraud, duress, concealment of assets or other facts showing that the agreement was not made voluntarily and with full understanding" (quoting *Forshee v. Forshee*, 145 P.3d 492, 502 (Alaska 2006))).

"[I]t makes sense for the relocation interim housing cost to go to you[, Charity]. . . . And that way you can, potentially, get paid on that as soon as possible."

At the same time, however, the court was well aware of another significant issue: how the parties would share the mortgage and utility costs while the marital home was being repaired for sale. Charity questioned whether she should be required to bear these expenses on her own, given that she did not "even have occupancy, nor does it sound like [she would] even be able to have occupancy." The court acknowledged that "when nobody's occupying the house, it makes sense . . . that there should be some credits given for that, at a very minimum." But it noted repeatedly, "I haven't ruled on credits." The court asked Charity whether she was "asking to be relieved of [her] obligation to pay on the mortgage and utilities moving forward." When Charity answered, "Correct," the court asked Darrell's attorney for his view on the matter. He replied that "what the insurance company [was] doing about paying [Charity's] current expenses and/or paying the mortgage on the place" was "a great unknown," and therefore the best the parties could do would be give the court some options in their proposed findings: "I don't disagree the court's going to have to decide utilities and mortgage." The court responded, "Yeah. Please add that in, . . . and I will rule once I get . . . those proposed findings."

We see no conflict at all between the court's preliminary post-trial ruling — intended to address Charity's immediate need for funds to cover her relocation and interim housing costs — and the court's later decision allocating responsibility for mortgage and utility costs, including credits as appropriate, after it had received the parties' written submissions. Nor do we see any unfairness in the court's disposition of these issues. In between its two orders — about a month after trial, and before the court had issued its written findings — the court had granted Darrell's unopposed motion to move into the residence in order to help preserve that marital asset. The situation thus

changed; Charity's housing costs were covered by the parties' insurance, whereas Darrell alone was incurring the expense of maintaining the marital home.

A superior court "must 'consider payments made to maintain marital property from post-separation income when dividing marital property,' " though whether "to give credit for those payments in its final property division" is discretionary.[15] Here, the court plainly structured its order to take into account both parties' payments related to the marital home and their living situations after the fire. We see no abuse of discretion in the court's decision of these issues.[16]

### D. The Categorization Of Darrell's Home Appraisal As A Marital Debt Requires Reconsideration.

The parties were unable to agree on the marital home's value, and after separation each of them had an appraisal done. Although both home appraisals were admitted as exhibits at trial, the court did not rely on them, the parties having agreed that the fire-damaged home would need to be reappraised after it was rebuilt and prior to sale.

Darrell paid $4,200 for his appraisal and classified it as a marital debt for which he was entitled to a credit. In its supplemental findings the court agreed, writing that the debt was a litigation cost but "should stay in [Darrell's] column on the spreadsheet because the appraisal was necessarily incurred." Charity argues that the

---

[15] *Morris v. Morris*, 506 P.3d 8, 13-14 (Alaska 2022) (quoting *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992)).

[16] In her reply brief Charity argues that she should have been credited for her own mortgage payments between the parties' separation and the fire, but we have repeatedly upheld the superior court's refusal to award such a credit when one party remains in the marital home after separation to the exclusion of the other, as Charity did here. *See, e.g.*, *Hockema*, 403 P.3d at 1091; *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1013 (Alaska 1995). The partial credit awarded Darrell for the time he occupied the marital home by himself reflected the unusual circumstance that Charity's housing was being paid for by the couple's fire insurance.

appraisal expense was not a marital debt but rather, as a cost of litigation, should more appropriately be included in the court's separate ruling that the parties should bear their own litigation costs and attorney's fees. She asserts that she did not include the cost of her own appraisal in the property spreadsheet because of the court's ruling that the parties' litigation costs remained their own responsibility.

We question whether the debt was appropriately categorized as marital. Darrell's appraisal was conducted in 2022, two years after the parties' separation. Debts incurred after separation are presumed to be non-marital in the absence of a finding that the separated couple continued to function as an economic unit,[17] which was not the case here. The appraisal was presumably intended to support Darrell's litigation position, just as Charity's appraisal was presumably intended to support hers (and the court in fact characterized Darrell's appraisal as "a litigation cost").[18] As well as the different treatment of the two parties' home appraisals, we note also an inconsistency in the court's treatment of Darrell's appraisal of Charity's business, which the court also characterized as "a litigation cost" but deemed "unnecessary," writing that Darrell was "solely responsible for this debt."

Because we are unable to discern the court's rationale for categorizing the cost of Darrell's home appraisal as both a litigation cost and a marital debt, we vacate this aspect of the court's findings and conclusions and direct the court to reconsider it on remand.

---

**17** *Dodson v. Dodson*, 955 P.2d 902, 910 (Alaska 1998).

**18** *See Beal v. Beal*, 88 P.3d 104, 115 (Alaska 2004) (affirming superior court's refusal to credit appraisal costs because parties hired separate expert appraisers and parties should not be forced to pay each other's litigation costs). In this case, Darrell's and Charity's appraisals reached much different opinions of value, and the parties' discussions at the time the appraisals were admitted into evidence strongly imply that each intended to challenge the other's estimate.

**E.    The Superior Court Did Not Err In Declining To Give An Offset For Darrell's Life Insurance Payments.**

In another cursory argument, Charity asserts that she paid $5,406 after separation for Darrell's life insurance premiums and should have been given an offset for it.    In support she cites only her trial testimony that after separation Darrell purchased a new life insurance policy "that was being charged to [her] credit card."  She does not direct us to any page of the record where a particular dollar amount appears, nor to any point in the proceedings when she actually requested such an offset from the superior court.  Because the argument is unsupported, we decline to consider it further.[19]

**F.    The Superior Court Did Not Err By Categorizing The 2019 Volvo As Marital Property.**

Finally, Charity argues that the superior court clearly erred by categorizing a 2019 Volvo as marital property to be divided; she contends that the vehicle actually belonged to the parties' adult daughter, who had received it from her parents on her 18th birthday "as a reward for academic excellence."[20]

The parties listed two Volvos on the joint spreadsheet submitted at trial, a 2017 model and a 2019 model.  The spreadsheet reflected the parties' agreement that the 2019 Volvo was marital property with a value of $40,000, though the spreadsheet also noted Darrell's position that it was an asset of Charity's business.  In Darrell's testimony he referred to the 2019 Volvo as their daughter's, though when asked whether it was titled in the daughter's name he testified that "[i]t was purchased by Charity under [her name] during the marriage" and "[h]ow it was titled, I don't know."  Charity testified that a Volvo was a "pre-separation joint gift," though she did not say which Volvo or to whom it was given.  She testified about having gone to Europe to sign for

---

[19]    *See Guilford v. Weidner Inv. Servs., Inc.*, 522 P.3d 1085, 1104 (Alaska 2023).

[20]    We note that the transcript pages Charity cites in support of this argument contain none of the factual detail she gives in her brief.

the two Volvos, that both had been paid off, that she had "covered all of the debt," and that she questioned the value her lawyer had placed on the newer Volvo.

It was many months later, in her motion to reconsider the court's written findings of fact and conclusions of law, that Charity clearly asserted that one of the Volvos belonged to their daughter. But at that time she contended that it was "[t]he 2017 Volvo," not the 2019 Volvo she addresses on appeal, that belonged to the daughter, and that it "was a marital debt but not a marital asset." In response the court simply noted that the 2017 Volvo had been paid off well before trial (as confirmed by Charity's own testimony), and the debt should be listed on her side of the ledger as "$0."

In short, the superior court had only vague and conflicting testimony to contradict the parties' agreement in the joint spreadsheet that the 2019 Volvo was marital property. Because we are not "left with a definite and firm conviction based on the entire record that a mistake has been made"[21] in the court's characterization of the vehicle as marital property, we affirm it.

## V.    CONCLUSION

We REMAND the superior court's property division order for minor corrections: the garage shelving, fence posts, and sauna should be removed as individual line items of personal property to be allocated, because their value is subsumed in the proceeds from the marital home sale or the fire insurance; and the court should reconsider the characterization of the cost of Darrell's home appraisal as a marital asset. In all other respects the property division order is AFFIRMED.

---

[21]    *Hockema*, 403 P.3d at 1088 (Alaska 2017) (quoting *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013)).