*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN SCOTT HOCKEMA, | ) | |
| | ) | Supreme Court No. S-16096 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KO-12-00458 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JANET HOCKEMA, | ) | |
| | ) | No. 7191 – August 25, 2017 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Steve W. Cole, Judge.

Appearances: Herbert M. Pearce, Law Office of Herbert M. Pearce, Anchorage, for Appellant. No appearance by Appellee Janet Hockema.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I.    INTRODUCTION

In 2012 John "Scott" Hockema filed for divorce from his wife, Janet Hockema. The superior court divided the marital estate equally and awarded Janet, who had been a homemaker throughout most of the marriage, spousal support for six years. Scott appeals the superior court's award of spousal support, its valuation of several pieces of marital property and a retirement account, the denial of an offset for certain mortgage payments made on the marital home, the denial of an offset for interim spousal

support paid, and the calculation of tax payments made on certain marital property. We affirm the superior court's valuation of the marital property and its decision not to offset the interim spousal support payments, but we conclude that the value of the retirement account and the amount of property taxes paid were calculated incorrectly. We also conclude that the court did not make sufficient findings regarding its award of spousal support, and we remand for further consideration of the necessity, amount, and duration of spousal support.

## II.     FACTS AND PROCEEDINGS

Scott and Janet Hockema married in 1987 and separated in November 2012. Scott filed for divorce the same month. In September 2013 the superior court ordered Scott to pay Janet $5,000 per month in interim spousal support, effective the preceding April, pending completion of the divorce proceedings. Because Janet was living in the marital home, the court granted Scott credit for the associated mortgage payments, which he was making. He was therefore required to pay Janet only the difference between the $5,000 spousal support obligation and the mortgage amount. When Janet moved out of the residence in September 2014, Scott continued to make mortgage payments on the home; he moved into the home the following month but continued to make reduced interim spousal support payments to Janet.

The divorce proceedings took place between May and December 2014. Both Janet and Scott offered extensive testimony about their respective incomes and the value of the marital assets. They both presented appraisals of their marital home in Kodiak. Janet's real estate agent appraised the home at $295,000, while Scott's real estate agent appraised it at $283,000. The home's septic system needed repair, and a local excavation company estimated the repairs would cost $19,500. The court had ordered Scott to repair it in January 2014; Scott failed to comply with the court order.

The court therefore adopted the lower appraisal of $283,000 but declined to offset the value of the home by an additional $19,500 due to Scott's failure to obey its order.

Scott and Janet had also placed a down payment on a plot of land adjacent to the marital home. During the divorce proceedings and without prior approval from the court, Janet relinquished the option to purchase the land and received a refund of the $10,000 down payment. The court counted the $10,000 refund against Janet's balance of marital assets.

In addition to their Kodiak property, Scott and Janet owned a six-plex apartment building in Coos Bay, Oregon, and six acres of land in Seven Devils, Oregon. The court found that Janet had constructive possession of the six-plex for a time but relinquished it to Scott in September 2014 because she was unable to keep up with the maintenance expenses. Janet admitted to collecting $3,580 in rent from the building's tenants without paying the building's mortgage or maintenance costs; the court allocated that amount of the marital assets to her.

Scott and Janet agreed at trial that the Seven Devils property was worth $60,000 and should go to Janet. But in August 2015 Janet disclosed that she had sold the property in June for $35,000, in violation of the court's order not to dispose of marital assets. The court assigned the property to her at its full value of $60,000 in the property distribution.

Two witnesses testified about Janet and Scott's excavation equipment. Michael Tope, a certified equipment appraiser with 30 years of experience in the construction equipment industry, evaluated the equipment twice based on photographs, information provided at different times by Scott and Janet, and visual inspection of the equipment. Tope did not start or operate the equipment or observe it in use. He determined that the equipment was in "fair" condition and valued it accordingly. He explained that "fair" meant the equipment "may require overhaul soon [and] may be old

or [have] suffered hard use." His first appraisal was based on information provided by Scott. He valued the parties' dump truck at $10,000, their excavator at $20,000, and their backhoe at $14,000. After receiving more information from Janet and conducting an inspection, he increased the respective valuations to $15,000, $25,000, and $17,500, largely based on the presence of "valuable accessories" that Scott had not informed him were present on the equipment.

Around the time of Tope's second evaluation, Scott also hired Patrick Anderson, a certified diesel and auto mechanic with extensive experience working on and operating heavy machinery, to repair the equipment and estimate the cost of further necessary repairs. Anderson performed $2,298.33 in repairs to the dump truck and estimated that it needed another $4,459.46 in repairs. He testified that it could not be moved from the property because it did not meet Department of Transportation (DOT) standards. Anderson performed repairs worth $194.90 on the excavator. He testified that it was not safe for use and would require $37,761.23 in further repairs to be safely operational. He also performed $323.29 in repairs on the backhoe and estimated it would require an additional $5,429 in repairs.

The court adopted Tope's revised valuations of the equipment at $15,000, $25,000, and $17,500, but it credited Scott for Anderson's repair work, which the court found had contributed to the increase in the equipment's value.

Scott and Janet agreed in court that Scott had one retirement account (IRA) with a value of $6,350. However, in reviewing the evidence, the court discovered two conflicting exhibits about the IRA: Scott's Exhibit 33 showed an account at U.S. Bank with a balance of $6,600 on January 8, 2014, while Janet's Exhibit P showed an account at Wells Fargo bank with a balance of $6,350 on March 31, 2014. The court concluded that, because the parties had failed to explain this discrepancy, it had "little choice but to find there are two IRA's in Scott's name, totaling $12,950." (Emphasis omitted.)

After valuing the marital property, the court addressed credits due to Scott since the parties' separation. In addition to other credits not at issue on appeal, the court granted Scott a credit of $5,274 for plumbing and heating repairs to the marital home, $3,880 for repairs to the home's flooring, $570 for electrical maintenance on the home, and $1,537 for painting the home's interior. It found that Scott had paid $3,400 in property taxes on their Oregon property and determined that he was entitled to an offset for that amount.

Scott requested an offset of $69,715.20 for interim spousal support payments he had made. The court rejected his request because "allowing such an offset would result in completely negating the whole point of ordering interim spousal support here in the first place" and granting Scott a credit for these payments "in addition to the tax write-off he already received would be double-dipping."

Scott also requested a credit for the $29,004.55 he had paid toward the marital home's mortgage since the parties' separation. The court determined that granting Scott a credit for mortgage payments made before Scott was ordered to pay spousal support would be inequitable given that Scott's income was approximately ten times Janet's. When Janet was living in the home after the court ordered interim spousal support, Scott had been allowed to deduct the mortgage payments from his $5,000 monthly support obligation. The court determined that granting him a credit for those payments "would essentially be a double-credit, and not one the court is inclined to award." Finally, when Scott was living in the marital home after Janet moved out, the court concluded that granting credit for the mortgage payments would be "the equivalent of letting him stay in the home free." The court therefore declined to grant Scott an offset for any of the mortgage payments.

After valuing the marital assets available for distribution, the court divided the marital estate and awarded Janet spousal support in accordance with the *Merrill*

factors, which guide trial courts in equitably allocating the economic effects of a divorce.[1]

The court found that Scott, who worked as a commercial fisherman and heavy equipment owner and operator, was the sole source of income during the marriage. After the parties' separation Scott also had access to the majority of their cash and liquid

---

[1] These factors, which derive their name from *Merrill v. Merrill*, 368 P.2d 546, 547-48 & n.4 (Alaska 1962), were codified in AS 25.24.160(a)(4), which governs property division:

> (A) the length of the marriage and station in life of the parties during the marriage;
>
> (B) the age and health of the parties;
>
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
>
> (D) the financial condition of the parties, including the availability and cost of health insurance;
>
> (E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
>
> (F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
>
> (G) the circumstances and necessities of each party;
>
> (H) the time and manner of acquisition of the property in question; and
>
> (I) the income-producing capacity of the property and the value of the property at the time of division[.]

AS 25.24.160(a)(2), which governs awards of spousal support, employs substantially the same factors.

assets. Janet had a high school education, and her primary occupation during the marriage was "running the household, managing some aspects of the parties' businesses, and caring for the children." Since the parties separated, Janet had worked at four different jobs, earning between $8.40 and $11 an hour. In her most recent employment she was earning $9.25 an hour. She submitted an exhibit showing that her average monthly expenses were approximately $3,450, and she testified that she spent "about the amount that [she] get[s] . . . between [her] work and [her] spousal support." Janet had received $35,000 from the sale of the Seven Devils property, but the court noted that the money would likely be used to pay attorney's and expert fees and to pay off personal debt of $23,000 that she had accrued since the parties' separation.

Janet insisted that she would prefer an award of spousal support to a disproportionate share of the marital assets. She testified that she would be unable to sell either the excavation equipment or the Oregon six-plex, and she would not be able to afford the maintenance costs on the Oregon six-plex or obtain a loan to re-mortgage the property in her name. Janet also indicated that it would be difficult for her to sell the Kodiak home because she did not have the money to repair the septic system or perform any other necessary repairs. Given the financial difficulty she would face if she were awarded the larger pieces of property, she requested an award of spousal support "or a cash judgment."

Janet's expert witness, certified public accountant Lisa Rogers, testified about Janet's expected income and costs. She calculated that approximately twelve years of spousal support at $60,000 per year would enable Janet to meet her living expenses through the average life expectancy. If Janet were awarded nearly all the marital property, Rogers estimated that Janet would still require approximately nine years of spousal support at $60,000 per year to retire securely. She did not assess Scott's ability to pay spousal support.

The court considered the parties' conduct and depletion of marital assets. It found that Janet's termination of the option to purchase the lot next to the marital home and her sale of the Seven Devils property for significantly less than the stipulated value were "serious violations" of court orders and unreasonable depletions of marital assets. The court found that Scott had also violated court orders and contributed to the depletion of marital assets by consistently failing to make timely spousal support payments, making "rude and crude comments" to Janet in his electronic transfers, and emptying their joint bank accounts of over $30,000 immediately after the parties' separation in November 2012.

Taking into consideration Janet's desire to receive support rather than a larger share of the marital estate, the court divided the marital property equally. It awarded Janet the stipulated $60,000 value of the Seven Devils property, a cargo trailer in Oregon, her vehicle, $1,100 from a "vacation account," five guns, her jewelry, the rental payments she collected from the six-plex, and the $10,000 she received from the lot adjacent to the marital home. It also placed on her the obligation to repay a $24,500 debt owed to a family member. The court awarded all other marital assets and debts to Scott and ordered him to pay Janet an $87,434 cash equalization payment.

In deciding to award Janet future spousal support, the court noted that she had been "adamant" in preferring to receive spousal support over additional property. The court also considered that most of the larger and more valuable assets were in Kodiak and that Janet did "not want the hassle and expense of being a landlord for their six-plex in Oregon."

Based on the evidence presented, the court determined that Scott's adjusted gross income for 2014 was $124,984, and his adjusted gross income for 2015 would be $107,900. It concluded that $216,000 in spousal support to be paid over a period of six years would provide both Janet and Scott with "sufficient funds to make investments,

prepare for the future, and ease into retirement when that time comes." The court ordered Scott to pay $4,000 per month for two years beginning on September 1, 2015; $3,000 per month for the next two years; and $2,000 per month for the final two years. In addition to the spousal support, the court established a two-year payment schedule for the $87,434 cash equalization payment and $35,898 in past due interim spousal support that was incurred largely because of the mortgage payment deductions Scott had continued applying to Janet's interim spousal support after she had vacated the marital home.

Following post-trial briefing and additional hearings on the issue of spousal support, the court entered a final decree of divorce in September 2015. Scott appeals the award of future spousal support; the valuation of the home, excavation equipment, and IRA; the denial of an offset for mortgage payments made on the marital home; the denial of an offset for interim spousal support paid; and the calculation of the tax payments made on the parties' Oregon properties.

## III. STANDARD OF REVIEW

> A trial court's division of marital assets comprises three steps:
>
> (1) determining what property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably. Under the first step, we review the "[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate" for clear error. Whether "the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment." The second step, the valuation of property, is a factual determination that we review for clear error.[2]

---

[2]     *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (alteration in original) (footnotes omitted) (quoting *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013)).

"Clear error is found 'only when we are left with a definite and firm conviction based on the entire record that a mistake has been made.' "[3] "We review the trial court's third step, the equitable allocation of property, for abuse of discretion."[4]

"Trial courts' . . . awards of spousal support are reviewed for abuse of discretion; we reverse such awards only if they are clearly unjust."[5]

## IV. DISCUSSION

### A. Legal Background

Alaska Statute 25.24.160(a)(4) governs the division of property in divorce. It requires property division to be made "in a just manner and without regard to which of the parties is in fault."[6] In dividing marital property, a trial court must consider the *Merrill* factors.[7] These factors are not exhaustive, and the court is not required to enter findings on each factor; the court's findings regarding the division of property need only be sufficient to indicate the basis of the court's conclusion.[8] The trial court has broad

---

[3] *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013) (quoting *Barnett v. Barnett*, 238 P.3d 594, 597 (Alaska 2010)).

[4] *Limeres*, 320 P.3d at 296 (citing *Beals*, 303 P.3d at 459).

[5] *Urban*, 314 P.3d at 515 (quoting *Barnett*, 238 P.3d at 597).

[6] AS 25.24.160(a)(4).

[7] *Merrill v. Merrill*, 368 P.2d 546, 547-48 n.4 (Alaska 1962); AS 25.24.160(a)(4). *See supra* note 1 (listing factors).

[8] *Oberhansly v. Oberhansly*, 798 P.2d 883, 884-85 (Alaska 1990) (quoting *Lang v. Lang*, 741 P.2d 1193, 1195-96 (Alaska 1987)).

latitude in dividing marital property,[9] and "we generally will not reevaluate the merits of the property division."[10]

Courts may award spousal support pursuant to AS 25.24.160(a)(2). In doing so, courts must consider nearly identical factors to those weighed in dividing marital property, although property division and spousal support "serve distinct purposes and are not interchangeable."[11] Spousal support is ordinarily disfavored, "because it is generally undesirable to require one person to support another on a long-term basis in the absence of an existing legal relationship."[12] We have therefore required that trial courts should, where possible, address spouses' financial needs through property distribution, rather than through awards of spousal support.[13] To accomplish this, courts should award a disproportionate share of the marital property instead of awarding spousal support.[14]

If necessary to address a disparity in the parties' financial needs and earning power, the court may award spousal support for a limited duration; this support is

**9**      *Bussell v. Bussell*, 623 P.2d 1221, 1222 (Alaska 1981) (citing *Schoning v. Schoning*, 550 P.2d 373, 374 (Alaska 1976); *Burrell v. Burrell*, 537 P.2d 1, 4 (Alaska 1975)).

**10**      *Dundas v. Dundas*, 362 P.3d 468, 477 (Alaska 2015) (quoting *Stanhope v. Stanhope*, 306 P.3d 1282, 1289 (Alaska 2013)).

**11**      *Hanlon v. Hanlon*, 871 P.2d 229, 233 (Alaska 1994) (citing *Lewis v. Lewis*, 785 P.2d 550, 553-54 (Alaska 1990)).

**12**      *Id.* (quoting *Jones v. Jones*, 835 P.2d 1173, 1179 (Alaska 1992)).

**13**      *E.g.*, *Dundas*, 362 P.3d at 480; *Hanlon*, 871 P.2d at 233.

**14**      *Dundas*, 362 P.3d at 480 (quoting *Day v. Williams*, 285 P.3d 256, 261 (Alaska 2012)).

generally classified as either reorientation alimony or rehabilitative alimony.[15] Rehabilitative alimony is "intended to further one spouse's 'job training or other means directly related to entry or advancement within the work force' " and need not be predicated on a finding that the party's reasonable needs cannot be met through property division.[16] Reorientation alimony is intended to provide the lower-earning spouse "an opportunity to adjust to the changed financial circumstances accompanying a divorce" and should be awarded only where unequal property division cannot adequately meet the spouse's reasonable needs.[17] It may be appropriate, for instance, where one spouse requires time to organize or sell non-liquid property or to obtain a job appropriate to his or her skills.[18] Because reorientation alimony is meant to be "transitional,"[19] we have noted that "it is difficult to imagine circumstances under which an award of reorientation alimony extending for longer than one year would be justified."[20]

A spouse seeking spousal support must present specific evidence establishing the need for that support, and the trial court must make specific findings regarding that spouse's financial needs and the court's reasons for determining that the

---

[15]     *Id.* (citing *Jones*, 835 P.2d at 1179).

[16]     *Id.* (quoting *Davila v. Davila*, 876 P.2d 1089, 1094 (Alaska 1994)) (citing *Barnett v. Barnett*, 238 P.3d 594, 601 (Alaska 2010)).

[17]     *Id.* (quoting *Davila*, 876 P.2d at 1094).

[18]     *Davila*, 876 P.2d at 1094 n.3 (citing *Money v. Money*, 852 P.2d 1158, 1163 (Alaska 1993)).

[19]     *Gallant v. Gallant*, 945 P.2d 795, 801 (Alaska 1997) (quoting *Davila v. Davila*, 908 P.2d 1025, 1027 (Alaska 1995)).

[20]     *Davila*, 876 P.2d at 1094 n.3. Awards of long-term alimony and permanent spousal support are not preferred. *See Hanlon v. Hanlon*, 871 P.2d 229, 233 (Alaska 1994) (citing *Jones*, 835 P.2d at 1179).

award was just and necessary.[21]  The court should also enter findings on the higher-earning spouse's ability to pay spousal support and "the impact that the payments could be expected to have on [the paying spouse's] own financial circumstances."[22]

**B.**     **The Court Did Not Err In Its Valuation Of The Parties' Excavation Equipment.**

Scott argues that the court's valuation of the excavation equipment was contrary to the evidence presented at trial.  He asserts that Tope had insufficient knowledge of equipment auctions in Kodiak and that Tope's appraisal was based on the erroneous assumption that the equipment was operable.

Tope, who testified that he has "bought and sold over $30 million in equipment," based his initial appraisal of the equipment on his conclusion that it required significant repairs.  He testified that he took into consideration the poor condition of the equipment and that his valuation was significantly lower than the average resale value of that equipment.  Tope also testified that he was informed the equipment was not up to DOT standard and that he adjusted his appraisals to take that fact into account.  He also testified that his appraisal took into consideration the fact that the equipment may not start.

Tope's testimony provides clear support for the court's valuation of the excavation equipment.  The court was entitled to credit Tope's testimony, and it was not clearly erroneous to adopt his valuation of the excavation equipment.[23]

---

[21]     *Hanlon*, 871 P.2d at 233 (citing *Dixon v. Dixon*, 747 P.2d 1169, 1174 (Alaska 1987)).

[22]     *Davila*, 876 P.2d at 1095.

[23]     *Fink v. Municipality of Anchorage*, 379 P.3d 183, 192 (Alaska 2016) ("When reviewing factual findings we ordinarily will not overturn a trial court's finding
(continued...)

**C.    The Court Did Not Err In Its Valuation Of The Marital Residence.**

At the time of the divorce proceedings, the marital home was in need of septic system repairs that a local excavation company estimated would cost $19,500. Scott argues that the court erred in declining to deduct the cost of the repairs from its valuation of the home. He argues that, because the court granted him credit for paying for other home repairs, and because the real estate agents' valuation of the house assumed a repaired septic system, the court should also have deducted the cost of the septic system repairs from the value of the home.

Two real estate agents offered different valuations of the marital home. Janet's agent valued the home at $295,000, while Scott's agent valued the home at $283,000. The court determined that both valuations were plausible, and we will not second-guess the trial court's judgment of witness credibility where its determination is supported by the record.[24] The court adopted Scott's proposed valuation of $283,000 — $12,000 less than Janet's proposed valuation of $295,000. It declined to offset the value by a further $19,500 for the septic system repairs for two reasons: first, because it would not cost Scott that much to repair the septic system himself — Scott has training in septic system installation and possesses a contractor's license — and second, because he had already refused to comply with the court's order to repair it in 2014. Because the court's valuation of the home was supported by evidence in the record, and because its refusal

---

[23]    (...continued)
based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence." (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009))).

[24]    *Id.* (quoting *S.K.L.H.*, 204 P.3d at 325).

to offset the home's value by a further $19,500 was an appropriate exercise of discretion, we affirm the court's valuation of the home.

D. **The Court Did Not Err In Awarding Past Due Interim Spousal Support And Declining To Credit Scott For Mortgage Payments Made On The Marital Home.**

Scott argues that the court abused its discretion in awarding Janet past due interim spousal support. In 2013 the court ordered Scott to pay $5,000 monthly in interim spousal support. While Janet lived in the home the court allowed Scott to reduce the monthly payments by the amount he paid on the mortgage. But once Janet moved out of the marital residence, Scott was required to pay her the full $5,000 monthly. He now asserts that he was "never informed that he would not continue receiving credit for the payments on the marital residence," and that, if he had been, he may have chosen to sell the house. Scott also argues that the award of $5,000 monthly in interim spousal support was based on Janet's financial need, which included the mortgage payments on the marital home, and that her financial need no longer amounted to $5,000 per month once she moved to Oregon. He argues that the superior court therefore abused its discretion in "retroactively modify[ing]" its interim spousal support order to require Scott to pay the full $5,000 for the 11 months that Janet was not living in the marital home. Accordingly Scott asks us to vacate the award of outstanding spousal support.

In its September 2013 clarification of its interim spousal support order, the superior court explained, "When the court ordered that [Scott] pay $5,000/month, it meant that those monies would include . . . the monthly mortgage on the house he was paying and [Janet] was living in, and her other living expenses he was covering." (Emphasis omitted.) The court reiterated that "[f]rom that $5,000 figure, [Scott] is entitled to credit for . . . any monthly mortgage on the marital home that he is paying, and her other living expenses." The court made clear that it granted Scott a credit for

mortgage payments while Janet was living in the home because they were a part of Janet's living expenses. Requiring Scott to pay the full $5,000 after Janet vacated the home — when the mortgage payments no longer offset Janet's living expenses — was therefore not an abuse of discretion.

Scott also asks us to grant him credit for the mortgage payments he made while he was living in the Kodiak home. Because Scott began living in the marital home after Janet moved out, the court found that "giving him a credit for his mortgage payments would be the equivalent of letting him stay in the home free," an outcome that the court deemed inequitable. In *Rodriguez v. Rodriguez* we held that the trial court did not abuse its discretion in refusing to credit the husband for post-separation mortgage payments made on the marital home while he lived there, reasoning that "any benefit which he may have imparted to the marital estate was offset by the benefit he received from the estate by living rent-free."[25]

In this case Scott was granted credit against his interim spousal support payments for the time that Janet was living in the marital home, but the court declined to credit Scott for the mortgage payments made while he lived there. Given the benefit Scott derived from living in the home during that latter period, it was not clearly unjust for the court to deny him credit for the mortgage payments he made.[26]

---

[25] 908 P.2d 1007, 1013 (Alaska 1995). *See also Edelman v. Edelman*, 3 P.3d 348, 354 (Alaska 2000) (citing *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992)) (rejecting the notion that a spouse must, as a rule, be credited for post-separation payments made to maintain marital property).

[26] Scott also argues in the alternative that because the marital home was part of the marital estate, he should be granted credit for half of the mortgage payments made after Janet moved out. He asserts that the court's equal division of the marital property dictates that the parties share equally the obligations owed on the marital estate. Our conclusion that the superior court was not required to grant Scott credit for any of the

(continued...)

**E.** **It Was Error Not To Credit Scott For $510.18 In Property Taxes Paid On The Parties' Oregon Property.**

The court credited Scott for a $3,400 tax payment on the parties' Oregon property; Scott argues that the court erroneously failed to credit him with an additional $510.18 he paid on the same day and $3,600 he had paid four days earlier. He notes that no evidence contradicted the amounts of these payments, and he asserts that the court's failure to credit them was merely a misinterpretation of the exhibit containing the figures. He therefore asks us to reverse the court's calculation and to remand with instructions to credit the additional $4,110.18 in tax payments.

Scott testified that he had recently made three separate payments to the Coos County, Oregon property tax department for overdue property taxes: a $3,600 payment on December 24, 2013, and two separate payments of $3,403.95 and $510.81 on December 28. Scott submitted an exhibit containing receipts for the $3,403.95 and $510.81 payments. But he submitted no documentation of a $3,600 payment; he provided only a document showing he had transferred $3,600 from his savings account to another personal account on December 24.[27]

The superior court granted Scott a credit for the $3,403.95 payment but did not discuss Scott's claims of having made the additional $510.81 and $3,600 payments. Because Scott submitted a receipt for the $510.81 payment, and nothing in the record contradicts this evidence, we conclude that it was error not to credit him for this payment. Because he did not submit any receipts or proof of payment for the $3,600

---

[26]     (...continued) mortgage payments applies with equal force to this argument.

[27]     The court concluded that "[i]t appears [Scott] had to move money from his savings account to his checking account" before he could make the $3,403.95 payment.

credit he seeks, we hold that the court did not err in denying him credit for an additional $3,600.

## F.     It Was Error To Value The IRA At $12,950.

Scott argues that the superior court miscalculated the value of his IRA. He notes that the court relied on two exhibits showing the existence of the IRA — Scott's Exhibit 33 and Janet's Exhibit P — to reach an aggregate value of $12,950. However, Scott asserts that these two exhibits show the same account: He transferred his IRA from U.S. Bank to Wells Fargo in early 2014, and the value of the account at the time of trial was $6,350. Scott asks us to remand to the superior court for adjustment of the marital estate accordingly.

The superior court reviewed the documentary evidence from the proceedings and concluded that the two exhibits showed the existence of two IRAs — one at U.S. Bank and one at Wells Fargo. The court acknowledged that these documents conflicted with both Scott's and Janet's trial testimony that only one IRA existed, but it stated that the parties had had "more than ample opportunity to explain this apparent anomaly."

Our review of the record reveals that only Exhibit P was admitted and entered into the record; Exhibit 33 was not offered at trial. Thus — consistent with the parties' testimony — the evidence shows only a single IRA with a value at trial of $6,350. We therefore conclude that it was error to count the IRA twice, and the court on remand should value the Wells Fargo IRA at $6,350.

## G.     The Award Of Spousal Support Must Be Remanded For Further Findings.

### 1.     The court's decision to award spousal support instead of a larger share of the marital estate is not sufficiently supported by its findings.

Scott argues that the trial court erred in awarding Janet extended spousal

support. He argues that the court improperly deferred to Janet's wish to receive spousal support and instead should have attempted to provide for her financial needs through unequal property division.

Before awarding spousal support a trial court must determine whether the financial needs of a disadvantaged spouse can be met by awarding a disproportionate share of the marital estate.[28] This determination must be supported by adequate findings.[29] For example, in *Davila v. Davila* we found an abuse of discretion where the alimony award could have been reduced significantly by reallocating the parties' retirement benefits.[30] And in *Hanlon v. Hanlon* we remanded for further findings regarding the reasons for granting spousal support, the basis for calculating the amount of the award, and the parties' financial needs and earning power.[31]

---

[28]     *See Dundas v. Dundas*, 362 P.3d 468, 480 (Alaska 2015).

[29]     *Urban v. Urban*, 314 P.3d 513, 516 (Alaska 2013) (citing *Barnett v. Barnett*, 238 P.3d 594, 601-02 (Alaska 2010)).

[30]     908 P.2d 1025, 1026-27 (Alaska 1995). If the marital property available for distribution is not liquid, however, we may uphold an award of alimony without requiring the trial court to further divide the non-liquid assets. *See, e.g.*, *Hammer v. Hammer*, 991 P.2d 195, 197-99 (Alaska 1999) (holding that unavailability of liquid marital assets, combined with ex-wife's limited work experience, disability, and parental obligations, rendered award of long-term alimony appropriate); *Dodson v. Dodson*, 955 P.2d 902, 911 (Alaska 1998) (upholding award of alimony where majority of property held by the parties was non-liquid and non-income-producing).

[31]     871 P.2d 229, 233 (Alaska 1994). *Cf. Urban*, 314 P.3d at 516-17 (upholding award of spousal support where trial court entered findings regarding each party's expenses and income and value of property available for distribution); *Hammer*, 991 P.2d at 197-99 (upholding spousal support award based on trial court's specific calculations of wife's monthly expenses and income).

When a trial court awards spousal support, it must also evaluate the paying spouse's ability to pay.[32]  In assessing a party's ability to pay spousal support, the court

> need not include a dollar-by-dollar accounting of [the party's] monthly income and expenses; the goal is to determine whether [the party] can reasonably assume the obligation of paying the . . . alimony award.  However, the trial court should make findings that indicate that it has considered [the party's] necessary expenses, including required work-related expenses, as well as the funds [the party] could use to meet those expenses.[33]

The trial court must also bear in mind that "[i]t is not unreasonable to expect a party to a divorce to have to reorganize financially, at least on a short[-]term basis."[34]  Where a property and spousal support award "takes practically all one spouse's income," we may find an abuse of discretion.[35]

> In the present case, the superior court noted in its findings that:

> Janet has been very adamant and consistent throughout these proceedings about wanting spousal support, as opposed to getting more property . . . .  Given her position on this issue, coupled with the fact that the larger, more valuable assets are in Kodiak (and she does not want the hassle and expense of

---

[32]  *Gallant v. Gallant*, 882 P.2d 1252, 1255 (Alaska 1994) (citing *Jones v. Jones*, 835 P.2d 1173, 1179 (Alaska 1992); *Renfro v. Renfro*, 848 P.2d 830, 834 (Alaska 1993)).

[33]  *Myers v. Myers*, 927 P.2d 326, 330 (Alaska 1996) (footnote omitted).

[34]  *Monsma v. Monsma*, 618 P.2d 559, 560 (Alaska 1980) (quoting *Allen v. Allen*, 554 P.2d 393, 395-96 (Alaska 1976)).

[35]  *Gabaig v. Gabaig*, 717 P.2d 835, 843 (Alaska 1986) (citing *Burrell v. Burrell*, 537 P.2d 1, 4 n.6 (Alaska 1975)); *see also Groff v. Groff*, 408 P.2d 998, 1001 (Alaska 1965) (finding abuse of discretion in part because husband was ordered to pay $1,025 per month in spousal support, debt service, and child support, although his net monthly income was only $1,012).

being a landlord for their six-plex in Oregon), none of these assets are therefore of any use to her, . . . and all of these arguments are reasonable on their face, so the court will honor her request and award her post-divorce, future spousal support.

(Footnote omitted.) Deferring to Janet's preference to receive spousal support rather than a disproportionate share of the marital property was an abuse of discretion. The court did not enter findings regarding whether her needs could be met through unequal property division or through a larger cash equalization payment. We therefore remand for the court to consider in greater detail what Janet's financial needs are and whether those needs can be met through some division of the marital property.

If the court finds on remand that Janet's financial needs cannot be met through property division, then it should conduct a more detailed inquiry into Janet's needs, the appropriate duration of any spousal support award, and Scott's ability to pay spousal support. The court did not enter detailed findings regarding Scott's future income or expenses. It acknowledged that the property awarded to Scott would be difficult to sell, yet it made no further findings regarding whether or how Scott could meet the financial burden it placed on him. The court stated only that "[t]his amount, spread over these six years, should be more than sufficient to support Janet and let her invest for her retirement, while still allowing Scott to have money to similarly live on and likewise, to prepare for his own retirement." If the court determines that an award of future spousal support is necessary, it should make additional findings regarding the amount and duration of the support award, Scott's ability to pay, and the financial burden it will place on Scott.

### 2. The court did not err in declining to grant Scott credit for interim spousal support paid.

Scott argues that, in awarding a total of $216,000 in future spousal support

to Janet, the court failed to take into consideration the $113,974 that Janet had already been awarded as interim spousal support. He notes that his own income for 2015 was expected to be $107,000, and he has no significant retirement funds. He states that awarding such a large amount to Janet without crediting him for the $113,974 previously awarded in interim spousal support was an abuse of discretion.

As the trial court noted, "given the disparity [in] the parties' income, allowing such an offset would result in completely negating the whole point of ordering interim spousal support here in the first place." The trial court concluded that granting Scott a credit for interim support payments in addition to the tax deduction he received for the payments would amount to "double-dipping." In light of the parties' circumstances, we conclude that it was not clearly unjust to refuse to grant Scott a credit for the interim spousal support payments he made.

### 3. The court did not err in failing to award Janet rehabilitative alimony.

Scott also argues that the superior court, in deciding to award long-term spousal support, erred when it rejected the option of making a short-term award of rehabilitative alimony instead. As we noted in *Dundas v. Dundas*, a party seeking rehabilitative alimony must present the court with a plan to undertake job training or further education.[36] Janet did not request rehabilitative alimony or present such a plan to the court. To the contrary, Janet testified that it would not be feasible for her to go back to school. The trial court therefore did not abuse its discretion in declining to award rehabilitative alimony.

---

[36] 362 P.3d 468, 480 (Alaska 2015) (quoting *Tybus v. Holland*, 989 P.2d 1281, 1288 (Alaska 1999)).

### 4. The court did not abuse its discretion when considering the conduct of the parties.

Scott also argues that the court failed to adequately consider the conduct of the parties, pursuant to AS 25.24.160(a)(2)(E), in its determination of the spousal support award. This argument is without merit. The court addressed the conduct of the parties at length in its written findings. The court recognized that Janet had sold marital property in violation of the court's order, and it sanctioned her for this behavior by allocating to her the value of the purchase option for the lot adjacent to the marital home and the full value of the Seven Devils property as though she had not sold it. It also took notice of Janet's failure to pay maintenance costs on the Oregon six-plex while she collected rent payments for one month, and it allocated to her the value of the rent payments she kept for herself.

The court also took into account Scott's violation of the court order directing him to repair the marital home's septic tank and his depletion of marital assets by withdrawing $30,000 from the parties' joint accounts so that Janet could not access the money. The court noted that Scott had "consistently failed to make his spousal support payments on time and in the amounts required."

The court took both parties' conduct into consideration in allocating the marital assets, and its conclusions were supported by the record. We find no abuse of discretion in this regard.

### 5. The court was not required to find that Janet had a significant health issue before awarding spousal support.

Finally, citing *Gallant v. Gallant*[37] and *Jones v. Jones*,[38] Scott argues that long-term spousal support is appropriate only if the spouse requesting support "has

---

[37] 945 P.2d 795 (Alaska 1997).

[38] 835 P.2d 1173 (Alaska 1992).

significant health issues that severely impact their ability to become self[-]sufficient." He notes that Janet does not have any mental or physical problems that affect her ability to work; indeed, he asserts that she worked as a bookkeeper and office manager for the marital business and obtained full-time employment after the parties' separation.

Scott's reading of these cases is incorrect. Although a court may consider the parties' medical expenses and the impact of a medical condition on a party's ability to work, as we approved in *Gallant* and *Jones*,[39] we have not held that a court must find "significant health issues" in order to award extended spousal support. To the contrary, we have, on more than one occasion, upheld awards of extended spousal support in the absence of medical concerns.[40] Extended spousal support must be premised on a finding that the spouse's financial needs cannot be met through an unequal division of property;[41] we decline to hold that it requires any particular finding regarding the lower-earning spouse's medical circumstances.

## V.    CONCLUSION

We REVERSE the court's valuation of Scott's IRA and its denial of a credit for $510.18 in property taxes paid, and we REMAND for recalculation of the marital estate accordingly. We VACATE the court's award of spousal support and REMAND for further proceedings consistent with this opinion. We AFFIRM the court's decision in all other respects.

---

[39]    *Gallant*, 945 P.2d at 801; *Jones*, 835 P.2d at 1179.

[40]    *E.g.*, *Redmond v. Redmond*, No. S-9915, 2002 WL 598910, at *2-3 (Alaska Apr. 17, 2002); *Broadribb v. Broadribb*, 956 P.2d 1222, 1225-27 (Alaska 1998).

[41]    *See Dundas*, 362 P.3d at 480.