*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN B. MORRIS, | ) | |
| | ) | Supreme Court No. S-17948 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-17-00886 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ANDREA L. MORRIS, | ) | |
| | ) | No. 7587 – March 25, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Jason M. Gist, Judge.

Appearances: Elizabeth H. Leduc, Gilman & Pevehouse, Kenai, for Appellant. Notice of nonparticipation filed by Lannette R. Nickens, Nickens Law & Mediation, Kenai, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson Justices.

CARNEY, Justice.

## I.      INTRODUCTION

A man appeals the division of marital property in his divorce. He argues that the superior court made five errors: crediting the opposing expert's valuation of certain marital property; refusing to credit him for post-separation mortgage and utility payments; treating a particular marital debt improperly; finding that a gift of marital property became his ex-wife's separate property; and declining to offset the property

awarded to his ex-wife with money she received from their child's insurance benefit. We affirm the court's order except for its treatment of the marital debt and its conclusion that the man's gift of marital property was not returned to the marital estate by his ex-wife.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

John and Andrea Morris married in 2001 and permanently separated in September 2017.  Their child was born in 2003.

During the marriage John worked various jobs, including heavy equipment operation and goldsmithing.  Andrea primarily worked as a hairdresser until she became disabled by kidney failure in 2008.  Andrea then received Social Security Disability Insurance (SSDI) for herself as well as about $500 a month in Children's Insurance Benefits (CIB) for their child.  Andrea was required to spend the CIB funds on the child and submit an annual accounting to the Social Security Administration.  Andrea received the CIB funds until November 2018 when John replaced her as the payee.

Throughout the marriage John and Andrea kept separate bank accounts; at trial they disputed who paid for which marital expenses and how much.  John testified that he paid for most of the household expenses — including utilities, cars, insurance, and the portion of their mortgage payments not covered by rental income — while Andrea's disability benefit paid for groceries and various items for their child.  Andrea, however, testified she paid for her gas, the shared phone bill, most of the food and clothing, and her student loans and medical bills.

In 2007 John and Andrea used money from the sale of his premarital home to purchase their marital home in Kenai; the marital home had a detached garage with an apartment.  They rented out the house at $1,400 a month to pay most of the mortgage and lived in the apartment.  The rest of the mortgage was paid with John's wages.

Andrea and their child remained in the marital home from September 2017 until Andrea moved to New Mexico in December. John continued to make the mortgage payments. After Andrea left, John moved back into the apartment with the child and rented the main house to his son for a reduced rent of $1,200 per month.

John and Andrea also purchased an investment property in Seldovia in 2017 for $39,500. Shortly after they separated, John sold the property at a loss.

### B.     Proceedings

John filed for divorce a month after he and Andrea separated. They reached an agreement on child custody but proceeded to trial to determine the division of their marital estate. The value and distribution of their marital property was contested during a three-day trial.

John testified that they had tried to sell their home seven to nine years earlier for $309,000 and had not had any inquiries. He testified that the house needed to be repainted, it had mold issues, and the roof, septic tank, and deck needed to be replaced.

Each called an expert witness to testify about the home's value. Andrea called John Cristiano, a residential appraiser who had done a property inspection and a sales comparison. Cristiano testified that there was a shortage of houses for sale in the area, the home was in average condition, and the condition of the septic system and well was typical for the area. He appraised the property by comparing it with similar homes in the area, adjusting for factors such as location, quality of construction, and condition. Based on this comparison, he valued the home at $310,000. He testified that his valuation took into consideration the age of the home and "deferred maintenance and repairs." But he acknowledged that he did not notice every issue with the home, and he disagreed with John's expert's valuation because it did not take into account the apartment above the garage.

John called Marti Pepper, a realtor, who valued the property at $258,000. While she acknowledged that Cristiano had a "more sophisticated" system for comparing properties, Pepper testified that Cristiano missed "red flags" such as the apparent condition of the roof, attic, and deck. She testified that one of her comparison properties had an above-garage apartment — albeit unfinished — and another had a bathroom and office in the garage.

John and Andrea also disagreed about how the court should treat jewelry that he had made and given to her while they were married. John testified that the raw materials for these pieces cost approximately $12,000 to $15,000, and that he had given the jewelry to Andrea as a gift. Andrea testified that when she moved to New Mexico, she "left all of his belongings . . . and put them in the garage, and the jewelry was part of it, because I didn't want anything to do with him." Later she had acquaintances collect her belongings from the house; there is no evidence that she asked them to retrieve the jewelry. John testified that he never found the jewelry.

They also disagreed about how their child's CIB funds should be considered in the property division. Andrea testified that she was required to provide an annual accounting of her CIB spending to the Social Security Administration and had done so. She testified that she used the money for summer camp, entertainment, school, clothing, and a cell phone for the child, and eventually began putting the money in an account that their child had access to. Andrea testified that when she moved to New Mexico, she received approval to use the money to furnish a bedroom there for the child. John was later granted sole legal and primary physical custody, and Andrea agreed to make him the payee.

The superior court later issued its divorce decree and findings of fact and conclusions of law. The court valued the marital home at $310,000 and assigned the value to John. After noting that it "found both experts to be very credible," the court

"ultimately found [Cristiano's] valuation to be . . . more accurate." It found that he had "adequately accounted for the deterioration of parts of the home" and that his valuation reflected a shortage of single family homes on the market.

The superior court found that John and Andrea purchased the Seldovia property for $39,500. The purchase was financed by a $15,000 interest-free loan from their child's savings account and a $17,000 loan taken out by John's business and in his name. No mention was made of the source of the remaining $7,500. The court then found that John sold the property for $35,000 but received a net amount of $33,000. The court found that $15,000 was promptly repaid to the child's account, and that John kept the remaining $18,000 as cash "to stay afloat and pay other bills."

The superior court concluded that the $18,000 in proceeds were marital and assigned the value to John. The court also found that the $17,000 loan "should be considered marital debt." However, noting that John asked only that a "$4,500 loss be counted as a marital debt," the court then assigned one half of that debt to John and made no mention of the $17,000 marital debt in its final accounting.

The court found the jewelry John had given Andrea was separate property. It noted that "John's testimony clearly established" they were gifts, and noted that if Andrea had kept them, "the court does not see why it would designate [them] as marital property. This does not change simply because [they were] lost or even given away." The court therefore held that it "will not treat the jewelry as marital property or assign value to it."

The superior court found that the SSDI and CIB benefits were "[o]ne of the most contested issues in [the] divorce." After finding that "parts of both parties' testimony [were] credible," the court found that the funds were "justifiably spent on the various day to day expenses for the family." It therefore did not credit Andrea with the funds she had received.

Finally, the superior court rejected Andrea's request that the court consider John's rental of the house to his son at a below-market rate. It reasoned that because Andrea had enjoyed the benefit of living in the home rent-free from the time the couple separated until she left the state, "an award to Andrea alone would be unequitable." The court also declined to credit John for his post-contribution mortgage and utilities payments.

John filed a motion to reconsider. He asked the court to reconsider its decision to assign him the house rather than to order its sale; its denial of a credit for his post-separation mortgage payments; its analysis of the Seldovia property sale; its ruling that the jewelry was not a marital asset; its treatment of the CIB payments; and its accounting of past-due child support. The court rejected most of the issues raised in the motion but adjusted John's equalization payment to Andrea to account for child support Andrea owed him.

John appeals the superior court's valuation of marital property; its decision not to credit him for post-separation mortgage and utility payments; its treatment of the Seldovia property debt; its finding that the jewelry he had given to Andrea became her separate property; and its decision not to offset the property awarded to Andrea with money she received from their child's CIB funds.[1]

## III. STANDARDS OF REVIEW

"There are three basic steps in the equitable division of marital assets: (1) deciding what specific property is available for distribution, (2) finding the value of

---

[1] Andrea does not participate in this appeal.

the property, and (3) dividing the property equitably."[2]  "[T]he characterization of property as separate or marital may involve both legal and factual questions."[3]

We review findings of fact for clear error and review legal questions de novo.[4]  Clear error exists "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[5]  Valuation of property "is a factual determination that we review for clear error."[6]  We review the equitable allocation of property "for an abuse of discretion, reversing only if it is 'clearly unjust.' "[7]  Issues not timely raised in the superior court are reviewed only "for plain error.  Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[8]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Clearly Err In Its Valuation Of The Marital Home.

John argues that the superior court's valuation of the marital home at $310,000 assigned too much weight to Andrea's expert's testimony and failed to account

---

**2**     *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019) (quoting *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

**3**     *Beals*, 303 P.3d at 459 (quoting *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006)).

**4**     *Pasley*, 442 P.3d at 744.

**5**     *Id.* (quoting *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017)).

**6**     *Id.* (quoting *Hockema*, 403 P.3d at 1088).

**7**     *Id.* (quoting *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017)).

**8**     *D.J. v. P.C.*, 36 P.3d 663, 667-68 (Alaska 2001) (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000)).

for the deteriorated condition of the home. We review the valuation of property for clear error and reverse "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[9]

The superior court heard conflicting testimony from the expert witnesses. Each criticized the other's methods. Andrea's expert Cristiano testified that John's expert's valuation failed to account for the apartment above the garage. John's expert Pepper testified that Cristiano failed to account for the condition of the property. The court found both experts credible, but found Cristiano's valuation more persuasive because the homes used for comparison "more accurately represented the [marital] home."

John argues that the superior court "failed to fully consider" the home's condition. But the court explicitly addressed that criticism and found that by using an "effective age" in his valuation Cristiano satisfied the concerns about the home's condition. John also argues that the court put too much weight on Cristiano's comparable properties because some had better locations or were kept in better condition than the marital home. But Cristiano's report and testimony took into account a number of factors including the quality of construction, the condition rating, remodel status, and location.

"[I]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[10] Because the superior court carefully

---

[9]     *Pasley*, 442 P.3d at 744.

[10]     *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017) (quoting *Lentine v. State*, 282 P.3d 369, 375-76 (Alaska 2012)).

considered the conflicting testimony and because Cristiano's testimony provided sufficient support for the superior court's valuation, the court did not clearly err.[11]

## B. The Superior Court Did Not Err By Declining To Credit John For His Post-Separation Mortgage And Utility Payments.

John argues that he should have received credit for "more than $55,000" in post-separation mortgage and utility payments for the marital home. Although the court must "consider payments made to maintain marital property from post-separation income when dividing marital property," it is not required to give credit for those payments in its final property division.[12]

Both parties made proposals for property division in their closing arguments. John did not ask the court to credit him for his post-separation mortgage and utility payments. He first made the request in his motion to reconsider, valuing these payments at $26,595. The superior court denied reconsideration of the issue and several others "because they [were] either new arguments, or they were adequately addressed in the initial findings."

Generally, "arguments raised for the first time on reconsideration are waived"[13] but can be reviewed for plain error.[14] "Plain error exists 'where an obvious

---

[11] *See Hockema*, 403 P.3d at 1089-90 (affirming valuation of excavation equipment where expert testified that he had adjusted appraisals to account for condition of equipment).

[12] *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992).

[13] *Wells v. Barile*, 358 P.3d 583, 589 n.17 (Alaska 2015).

[14] *McCarter v. McCarter*, 303 P.3d 509, 513 (Alaska 2013) (rejecting arguments raised for the first time in a motion for reconsideration after finding no plain error); *Schaeffer-Mathis v. Mathis*, 407 P.3d 485, 495 (Alaska 2017) (noting that because an argument raised for the first time in a motion for reconsideration is untimely, it is

(continued...)

mistake has been made which creates a high likelihood that injustice has resulted.' "[15]

The superior court carefully considered John's payment of the mortgage and utilities for the marital home in response to Andrea's request that the court credit her for John's post-separation occupancy of the marital property and rental of the main house to his son at a below-market rate. The court balanced John's post-separation contributions against the benefit he received from living in the apartment and from renting the main house to his son at a below-market rate. The court noted that Andrea's request "ignores that prior to her move to New Mexico, she enjoyed the same benefits that she now complains John began receiving in 2018 when she left." As a result, the court concluded that to give Andrea credit "would be unequitable." It would also have been inequitable to give such a credit to John for the similar benefits he enjoyed. There is no plain error in the court's denial of a credit for post-separation costs of the marital home.

### C. The Superior Court Erred In Its Distribution Of The Seldovia Property.

John asserts that the superior court erred by not assigning him $17,000 in marital debt from the purchase of the Seldovia property. Of the $39,000 purchase price, $32,000 was financed by a $15,000 interest-free loan from their child's account and a $17,000 loan taken out by John's business and in his name. John sold the property for $35,000 and netted $33,000 after closing costs. He repaid their child's account and retained the remaining $18,000. In his closing argument John asked the court to assign only the pre-closing-cost loss of $4,500 "as a marital debt," not the $17,000 loan. The

---

[14] (...continued)
subject to plain error review).

[15] *D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001) (quoting *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000)).

superior court "recaptured"[16] the $18,000 that John retained and included that amount in its calculation of the marital assets.[17] The court then reduced that amount by one half of the $4,500 loss that John still contends is "marital debt," and assigned him the remaining value of $15,750. The court also classified the $17,000 loan as a marital debt but neither included nor assigned that debt in the final accounting.

John first requested that the $17,000 debt be assigned to him as a marital debt in his motion for reconsideration after he received the court's decision. The court denied reconsideration because it was "either [a] new argument[] or [it was] adequately addressed in the initial findings." We review John's untimely argument for plain error.[18]

Classifying the debt as marital but failing to include it in the final distribution of the marital estate was plain error. The superior court assigned the proceeds of the sale to John. Because John received the benefit of the sale he should also have been assigned the burden of the debt he used for the original purchase. Although the superior court has considerable discretion when dividing marital property,[19] it cannot fail to do so altogether. Having determined an asset or debt is marital, the court must distribute it equitably.[20] There is a high likelihood that assigning one party the proceeds

---

[16] *See Aubert v. Wilson*, 483 P.3d 179, 189 (Alaska 2021) ("If the court finds the asset was dissipated, wasted, or converted to non-marital form, it may 'recapture' the asset.").

[17] John does not appeal the court's recapture of the Seldovia proceeds.

[18] *Schaeffer-Mathis*, 407 P.3d at 495 (citing *D.J.*, 36 P.3d at 668).

[19] *See Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991) ("The trial court has broad discretion in property division cases.").

[20] This holding is consistent with our requirement that "the trial court *must* render findings of ultimate fact that support any decreed property division; the findings
(continued...)

of a sale but not the corresponding debt has resulted in injustice. We therefore remand the property division for the superior court to equitably apportion the $17,000 in marital debt.

We also note that the value of the debt assigned to John should be offset by a true and accurate accounting of the proceeds he received from the sale. The court's $15,750 value of the proceeds is incorrect. Both John and the court incorrectly classified the $4,500 loss as a marital debt. John and Andrea purchased the Seldovia property with $39,500 in marital funds. They sold the property at a gross price of $35,000. After closing costs, John received $33,000. Thus, the total loss to the marital estate was $6,500. When valuing the proceeds from the sale, the superior court properly started with the $33,000 in net proceeds. It subtracted the $15,000 repaid to the child's account and was left with $18,000 in cash proceeds that John retained. The valuation should have ended there. Because the $18,000 sum is derived from the net proceeds of $33,000, the $6,500 loss to the marital estate is already accounted for. However, the court discounted the $18,000 valuation by half of the $4,500 loss that John claimed he incurred from the sale, which mistakenly inflated the loss the marital estate incurred to John's benefit.

This missing $2,250 affects the entire chain of calculation involved in the court's asset distribution. For example, there is a $2,250 discrepancy between the sum of the assets listed and the court's calculation of total assets. We therefore remand to the superior court to correct or clarify its distribution of the Seldovia property.

---

[20] (...continued)
must be explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision." *Id.* (emphasis added). Here the superior court offered no explanation as to why it chose not to assign the debt.

**D.    It Was Error to Conclude Andrea Did Not Return The Jewelry To The Marital Estate.**

The superior court found that the jewelry John made and gave to Andrea was her separate property. John argues the jewelry should be considered marital property because he bought the raw materials with marital funds. He urges us to follow other states that treat interspousal gifts as marital property. "[W]hether the trial court applied the correct legal rule . . . is a question of law that we review de novo using our independent judgment."[21]

We have not decided whether property that starts as *marital* property can be transmuted by gift into one spouse's *separate* property.[22] The superior court found that it could and did. It found that "John's testimony clearly established" the jewelry was a gift, and noted that if Andrea had kept the jewelry, "the court does not see why it would designate [the jewelry] as marital property. This does not change simply because it was lost or even given away." The court therefore held that it "will not treat the jewelry as marital property or assign value to it." But Andrea clearly intended to return the jewelry to the marital estate by leaving it with John's possessions in the garage at the marital home. It is therefore not necessary to decide whether there was transmutation.[23]

Assuming the jewelry was Andrea's separate property, John argues she "had left the jewelry behind for [him] when she moved to New Mexico, indicating that

---

[21]    *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019) (alteration in original) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[22]    We have repeatedly addressed and refined the transmutation analysis for property that starts as separate and becomes marital. *See, e.g.*, *Kessler v. Kessler*, 411 P.3d 616, 621 (Alaska 2018); *Fortson v. Fortson*, 131 P.3d 451, 463-64 (Alaska 2006); *Burgess v. Burgess*, 710 P.2d 417, 422 (Alaska 1985).

[23]    *See State v. ACLU of Alaska*, 204 P.3d 364, 369 (Alaska 2009) ("[T]his court should not issue advisory opinions or resolve abstract questions of law.").

she believed it was a marital asset." At trial, Andrea testified that the night she kicked John out of the house, she "left all of *his* belongings . . . and put them in the garage, *and the jewelry was part of it*, because I didn't want anything to do with him." Later, when she directed her friends to collect her belongings from the house she did not instruct them to retrieve the jewelry. The record before the superior court shows that Andrea left the jewelry with the rest of John's possessions, indicating her intent that the jewelry "be treated as marital property for the purpose of dividing property in the event of a divorce."[24]

We need not decide the novel question of whether the jewelry actually was separate property because Andrea's actions demonstrate her clear intent to return the gifts to the marital estate. It was therefore error to classify the jewelry as her separate property. We remand to the superior court to classify the jewelry as marital property and to determine how to equitably distribute it given that it has disappeared.

### E. The Superior Court Did Not Err When It Considered Andrea's CIB Payments.

John argues that the superior court should have made specific findings about how their child's CIB funds were used and then adjusted the final property award based on the findings. He also argues that "[a]t a minimum" the court should have accounted for payments Andrea received after she moved to New Mexico. We review factual findings for clear error.[25] We review a court's decision to distribute a disputed piece of property "for an abuse of discretion, reversing only if it is 'clearly unjust.' "[26]

---

[24] *Kessler*, 411 P.3d at 619 (emphasis omitted).

[25] *Pasley*, 442 P.3d 744.

[26] *Id.* (quoting *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017)).

The superior court made specific findings regarding Andrea's use of the CIB payments. After noting that their testimony about the CIB funds "was markedly different," the court "found parts of both parties' testimony credible." The court found that because John worked out of town, Andrea handled "much of the day to day finances at home." It concluded that their child's CIB benefits "were justifiably spent on the various day to day expenses for the family" and that "[a]ny other conclusion would only be speculation on the court's part."

The superior court's findings are supported by the record, and we "grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony."[27] Andrea testified that she spent the money on family expenses, that she was required to submit an annual accounting of how she spent the funds, and that she sought prior approval for debatable spending.[28] John testified that he was not aware where the money went but that he did not believe the money went toward household bills. He offered no evidence to support his speculation. The evidence supports the court's treatment of the CIB benefits.[29]

---

[27]   *Stanhope v. Stanhope*, 306 P.3d 1282, 1287 (Alaska 2013) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009)).

[28]   In addition, given Andrea's testimony that she received approval to spend CIB funds on a room for their daughter in Andrea's New Mexico home, the superior court reasonably found that these post-separation funds had not been misappropriated.

[29]   We have previously turned to federal law for guidance when calculating child support. *See Osmar v. Mahan*, 53 P.3d 149, 152 (Alaska 2002) (holding CIB payments meant for an unrelated stepchild did not constitute income because federal law requires funds to be spent on eligible child alone).

The superior court did not clearly err or abuse its discretion in its consideration of the CIB funds.[30]

## V.    CONCLUSION

We AFFIRM the superior court's valuation of the marital property and its decision not to offset the award by post-separation payments or the CIB funds. However, we REMAND for reconsideration of the distribution of the Seldovia property and the treatment of the jewelry.

---

[30]    We note that the superior court did not fail to "account for the payments Andrea received" in the final distribution.  In his motion for reconsideration, John asked the court to offset Andrea's award by the "back [child] support" she owed him given she "will have no ability to repay" it.  The court then reduced the amount he owed Andrea based on the parties' stipulation that Andrea owed $2,928 in back child support based on her income from both SSDI and CIB.  In *Miller v. Miller*, we held that CIB benefits count as income for purposes of calculating the child support award, but that the parent who "earned the benefits . . . [the child] receives . . . must be credited for [those] payments made to [the child] on [the parent's] behalf." 890 P.2d 574, 577 (Alaska 1995). However, because the parties stipulated to the amount of past-due child support and Andrea does not participate in this appeal, we do not address this issue.  *See also Rosenbaum v. Shaw*, 459 P.3d 467, 475 (Alaska 2020) (allocating risk of loss to parent who overpaid child support because of failure to account for CIB payments).